[No. S030416. Aug. 6, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
SERGIO OCHOA, Defendant and Appellant.

406

414

COUNSEL

Conrad Peterman, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Robert S. Henry and Brad D. Levenson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—A jury convicted defendant Sergio Ochoa of two counts of first degree murder (Pen. Code, § 187; all further statutory references are to

this code unless otherwise indicated) and one count of attempted second degree robbery (§§ 664, 211). The jury also found true the allegations that a principal was armed with respect to all three offenses (§ 12022, subd. (a)(1)) and that defendant personally used a firearm with respect to one of the murders and the attempted robbery (§ 12022.5). Having found true the special circumstance allegations that defendant committed multiple murders (§ 190.2, subd. (a)(3)), and that a murder was committed while defendant was engaged in robbery (§ 190.2, subd. (a)(17)(A)), the jury set the penalty at death. The trial court denied defendant's motion to modify the sentence (§ 190.4, subd. (e)). This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239).

For the reasons stated below, we conclude the judgment should be affirmed in its entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *The People's Case*

##### a) *The gang rivalry*

In late 1989 and early 1990, defendant's 18th Street Gang was in a "war" with a rival gang, Crazy Riders. On December 15, 1989, defendant was walking with "Pollo" near Pico Boulevard and Fourth Avenue in Los Angeles[1] when a white Toyota with license plate No. "2MTV878" pulled up beside them. A Crazy Riders member named "Pompis" exited the car and shot three times at defendant and Pollo. Defendant and Pollo ran to Fifth Avenue, where they were shot at twice more.

The next day, the Crazy Riders Gang shot Luis Magallenes, an 18th Street Gang member nicknamed "Bandit." Later that same day, an 18th Street Gang member nicknamed "Flacko" fatally shot Crazy Rider Nelson Mauricio Donis to retaliate for the shooting of Magallenes.

On January 3, 1990, at approximately 5:00 p.m., 18th Street Gang members Jacinto Alonzo, and Walter Aguilar and his brother, Oscar Quijada, were driving near 12th Avenue and Venice Boulevard. The white Toyota pulled up and Pompis shot Quijada in the forehead. He was taken to the hospital and survived.

---

[1]All of the events described occurred in the City of Los Angeles.

b) *The Navarette murder*

At approximately 8:00 p.m. on January 3, 1990, Aguilar and Alonzo were assembled at Pico Boulevard and Wilton Avenue with fellow gang members Juan Velasquez and Mauricio Soriano. Defendant, driving a red truck, arrived and stated he had just seen the Crazy Riders' white Toyota on Pico Boulevard. Aguilar, Alonzo, Velasquez and Soriano entered defendant's truck. Aguilar brought a double-barreled shotgun with him, and the 18th Street Gang members set off to find the Crazy Riders.

Defendant drove eastward on Pico Boulevard. Defendant stated, "There they are." Defendant accelerated and changed lanes so his truck was adjacent to the Toyota, on its left. Two shots were fired from the shotgun. After the shooting, defendant turned the truck and drove northbound on Kingsley Drive.

The white car in question was not the Toyota belonging to the Crazy Riders, but a Datsun driven by decedent Pedro Navarette, whose passenger at the time was his brother, Rudolfo Rivera. Navarette was not a rival gang member. The beginning of Navarette's license plate number read "2MTY." Navarette fell on the steering wheel after the second shot was fired; the car drove onto the sidewalk and crashed into a wall. Rivera heard the truck passengers' voices after the second shot, but he could not understand what they were saying. The cause of death was a shotgun wound to the head.

Defendant was first questioned on January 22, 1990. He stated he had heard nothing about a shooting at Pico Boulevard and Kingsley Drive of a car with a license plate beginning with "2MTY." On February 13, 1990, defendant signed a statement in which he admitted he drove the truck during the shooting. Defendant stated Velasquez requested a ride to Normandie Avenue and defendant obliged; Soriano, Alonzo and Aguilar also traveled as passengers. A car resembling the one that belonged to the Crazy Riders was also driving eastbound on Pico Boulevard. Defendant suddenly heard a loud bang, and the car window cracked. Defendant stated he looked in his mirror and saw Velasquez holding a shotgun. Defendant had not formerly known that Velasquez was armed.

Detective Michael Bercham described defendant as a "hard-core" gang member. Defendant had 18th Street Gang tattoos all over his body. After his arrest on January 21, and interview on January 22, 1990, he added a tattoo over his eye that depicted the number "187," the California Penal Code section proscribing murder.

c) *The Castro attempted robbery and murder*

On the evening of January 20, 1990, defendant, Soriano, Velasquez, and fellow 18th Street Gang members Oscar Montes and David Lozano were

assembled at Pico Boulevard and Wilton Avenue. Defendant said, "Let's go do a jack." When Lozano stated he did not want to go, defendant told Lozano to "do something for the neighborhood," meaning the 18th Street Gang. Lozano agreed to participate.

Lozano drove the other 18th Street Gang members in his car past a white Trans Am that was parked on St. Andrews Place between Fifth and Sixth Streets. Soriano commented it was a nice car. Defendant agreed it "was a nice car to get." Lozano parked the car. His four passengers exited the car and approached the Trans Am.

Jose Castro was sitting in his Trans Am. Defendant and Soriano went to the left side of the car; Montes and Velasquez went to the right side of the car. Defendant, the only assailant with a gun, placed it in Castro's face and ordered him to leave the car. Montes and Velasquez, anticipating Castro's flight, entered the car. Castro refused to exit. Defendant stated, "I'm gonna' shoot him." Castro held on to the wheel.

David Mandich was driving on St. Andrews Place from Sixth Street toward Fifth Street. He saw four males, in their mid-teens to early 20's, standing around a white Trans Am. Two of the four were on the left and two were on the right. The tallest of the four talked to a person in the driver's seat. The tall one then pulled a gun from his jacket and shot the driver. All four males began running toward Fifth Street.

Lozano was surprised to see the four return, as he expected them to drive away in the Trans Am. Defendant stated he had shot the man in the leg. Defendant further stated the man had cried, "Oh, shit, oh shit." Defendant wore a silver Raiders jacket with black lettering.

Mandich described the incident to a police officer that evening. He described the shooter as a Black or dark-complected Hispanic male between five feet ten inches and six feet tall, wearing a dark athletic jacket with white letters in a semicircle on the back. Detective Paul Coulter testified that the shiny "satiny" jacket could have appeared darker than its actual color due to the lighting conditions in the area.

Mandich was unable to select anyone from a photographic lineup. On September 4, 1990, he selected defendant from a live lineup that included six males. Mandich had no doubt that he was correct, unless defendant "had a twin brother." At trial, Mandich again identified defendant as the perpetrator.

Defendant was taken into custody for an unrelated matter on January 21, 1991. He was wearing a silver Raiders jacket, which had letters in a

semicircle on the back. Defendant stands six feet tall; the other individuals involved in the Castro robbery were five feet six inches tall or shorter.

Ruben Sanchez, an expert on latent fingerprints, took fingerprints from the Trans Am. Gilbert Aguilar, a Los Angeles Police Department fingerprint expert, testified these prints matched the samples of Soriano and Velasquez.

Dr. Irwin Golden, a deputy medical examiner coroner, performed the autopsy of Jose Castro, who died from a gunshot to the chest. The bullet entered through the victim's left shoulder, passed through his chest and lung, and exited on the right side of his chest. The wound was consistent with the scene described by Mandich: the shot was fired by an assailant standing outside the driver's side door.

### 2. *The Defense Case*

Los Angeles Police Officer Jason Loya interviewed David Mandich on the night of the shooting. Mandich indicated four males, three Black and one Hispanic, all ranging in age from 17 to 22, had surrounded a Trans Am on St. Andrews Place. The shooter was a Black male, approximately five feet ten inches to six feet tall. He wore a dark blue or black jacket with letters on the back.

Los Angeles Police Officer Frank Bolan helped prepare a photographic display in March 1990, from which Mandich was unable to identify defendant. Officer Bolan also participated in the staging of an in-person lineup on September 4, 1990. Jose Castro's sister, his widow, the widow's sister and her son were present, seated in the back row. Officer Bolan warned them not to have any contact with anyone else. After making his selection, Mandich asked if he had selected the right person. Officer Bolan stated he could not answer that question. Mandich told the officer he was positive of his selection. Mandich again sought confirmation, and Officer Bolan again refused.

### B. *Penalty Phase*

### 1. *The People's Case*

On August 11, 1986, 14-year-old Lionel Fricks was walking on Exposition Boulevard, carrying a "semi-big" radio. Defendant and another male punched Fricks several times. Once Fricks had fallen to the ground, one of the two males took Fricks's radio. Defendant pleaded guilty to second degree robbery.

On July 10, 1989, defendant pleaded guilty to driving or taking a vehicle without the owner's consent in violation of Vehicle Code section 10851.

On January 20, 1990, at approximately 11:30 p.m., Freddie Garcia was at a gas station on La Brea Avenue. Defendant and three other males approached him. The males kicked Garcia to the ground; when he rose, defendant punched him. Defendant warned Garcia, "Give up the car, otherwise I'm going to shoot you." Another male put a gun to Garcia's stomach, although defendant did the talking. Defendant entered the car, and drove the other three males away. Defendant pleaded guilty to robbery with the allegation that a principal was armed with a firearm.

On the evening of April 5, 1992, defendant participated in a fight between Black and Hispanic inmates of the North County Correctional Facility. Even after officers had separated the combatants, defendant tried to provoke the Black inmates into further conflict.

On July 22, 1992, defendant was transported from court to the North County Correctional Facility. Deputy Sheriff David Mertens searched defendant and found a makeshift handcuff key in a small incision inside his wristband. Deputy Mertens tested the key and found it easily opened a pair of Smith and Wesson handcuffs, the kind most commonly used to control inmates being transported back from court. Another deputy later searched defendant's property bag and found a shank.

Rudolfo Rivera, Navarette's brother and his passenger on the night of the murder, testified he and Navarette were living in their family home when Navarette was murdered. Navarette worked six days a week, not returning home until 11:00 p.m., to help support the family. Navarette's death was especially difficult for his mother, who was still taking pills for her high blood pressure in September 1992, nearly three years after the shooting.

Maria Mastrocinque, Jose Castro's older sister, testified he was loving, peaceful and sensitive. After finishing high school, Castro volunteered for the Marines, in which he served for two and a half years. The family used to get together every week. Now, Castro's mother is "a walking wound that will never heal."

Gladys Castro, the youngest sister, testified Castro always helped and was there for her and that her mother is "lost" and "not all there." Gladys further stated that she is afraid to sleep at night.

Martha and Jose Castro were high school sweethearts who married in 1979. Castro was a very giving and loving man, who had a close relationship

with their 15-year-old son, Joey. Joey keeps his feelings to himself and has been attending counseling. After Castro's death, Joey began misbehaving in school. He has since improved his behavior, but does not want to talk about the murder. He wants to be like his dad. He often asks his mother "what would Daddy do" in certain situations.

### 2. *The Defense's Case*

Leland Bradford was with defendant when Lionel Fricks was robbed. The robbery was the idea of Juan Lombrero, who first hit Fricks and grabbed his radio. Bradford admitted that before he was arrested, defendant had the radio and gave it to Lombrero because the police were looking for it.

Besides participating in the fight and possessing the handcuff key and shank, on one occasion defendant possessed food and United States currency in excess of permitted limits and "roamed" (entered a jail tier other than his own) on another. These incidents were the extent of defendant's documented infractions while in custody.

Deputy Sheriff Dennis Parker and Deputy Sheriff Robert Thomasser observed the April 5, 1992, jail fight. The two inmates who resumed fighting after officers had separated the two groups were inmates Rene Munoz and Christopher Wood. Rosendo Florentin, a registered nurse, treated defendant after the fight. Defendant suffered a one-inch laceration on his eyebrow. Nurse Florentin treated three other inmates that night; defendant was the only inmate sent to an outside hospital for his injuries.

Rosalba Gallegos, defendant's older sister, and Eduardo Ochoa, defendant's father, described defendant's childhood. Defendant was the fourth of five children born to a shoemaker and a homemaker. The family lived in Tijuana when defendant was born, and moved to San Diego three years later. A few months later, the family moved to Figueroa Street in Los Angeles. It took defendant's father six months to find work as a shoemaker; defendant's mother worked as a housecleaner. Neither was home during the day.

Some of the neighborhood children mistreated the Ochoa children, pouring water on their backs while calling them "wetbacks," cutting up their clothes and throwing away their food. When defendant's parents spoke to the other children's parents, they responded by threatening to report the Ochoa family to immigration authorities. When defendant was in kindergarten the family moved to Welcome Avenue, where defendant had no problems in school. About seven years later, the family moved to a Black neighborhood near Arlington Avenue. Some neighborhood kids threw rocks

and bottles every night at the Ochoa door. Gallegos called the police but they never came. The home was also burglarized. When defendant was approximately 16 years old, his sister was severely beaten.

Defendant had done well in elementary school, but he began missing school and dressing differently once he was in high school. Dr. Michael Maloney, a clinical psychologist and professor at University of Southern California School of Medicine, evaluated defendant and reviewed his school records. In fourth grade, defendant was described as "capable," maybe even "bright." In sixth grade, defendant was "working hard," and performing "adequately." His grades plummeted after sixth grade, when he became involved with gang activity, and he received D's and F's in junior high school. In the eighth grade, defendant scored in the 26th percentile in reading and in the 27th percentile in mathematics. By the time Dr. Maloney evaluated defendant, he registered an IQ of 74. This placed him in the fifth percentile of society, although that ranking was "probably a low estimate of his ability." Defendant read at an eighth grade level, and his arithmetic skills equaled those of a fifth grade student.

Lisa Martinez was defendant's girlfriend from 1984 until 1987, and she is the mother of defendant's daughter, Claudia. Defendant loved and played with Claudia. Defendant had studied with Lisa to become a dental technician. He earned his diploma but was unable to find work in the field.

Defendant has maintained close ties with his sister's children. They visit him in prison and get excited when he telephones.

Defendant's performance on the Minnesota Multiphasic Personality Inventory did not indicate he was schizophrenic or psychotic. "There is some suggestion he has always been somewhat insecure, but not grossly disturbed." The doctor concluded that defendant "knows right from wrong."

James Park, a correctional consultant and former corrections officer, testified that prisoners serving life without possibility of parole terms are automatically sent to maximum security "level-four" facilities, from which there has never been an escape.

## II. Discussion

### A. *Guilt Phase*

#### 1. *Joinder of the Navarette and Castro Charges*

 Defendant moved to sever counts 1 and 2 (the Castro homicide and attempted robbery) from count 3 (the Navarette homicide). The trial court

denied the motion. Defendant now contends the denial was erroneous and deprived him of a fair trial and due process of law.

The law prefers consolidation of charges. (*People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Where, as here, the offenses charged are of the same class, joinder is proper under section 954. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*); *People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145, 939 P.2d 259] (*Bradford*).) Defendant can predicate error in the denial of the motion only on a clear showing of potential prejudice. (*Kraft*, at p. 1030; *Bradford*, at p. 1315.) ■ We review the denial of defendant's motion for an abuse of discretion, that is, whether the denial fell " 'outside the bounds of reason.' " (*Ochoa*, at p. 408, quoting *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].) We find the trial court properly exercised its discretion in denying the severance motion.

We have developed criteria to guide evaluations of trial court decisions on severance motions. " ' "Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." ' " (*Kraft, supra*, 23 Cal.4th at p. 1030.)

Cross-admissibility of evidence is sufficient but not necessary to deny severance. (*Bradford, supra*, 15 Cal.4th at p. 1316.) As the four-part test is stated in the conjunctive, joinder may be appropriate even though the evidence is not cross-admissible and only one of the charges would be capital absent joinder. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1244-1246 [74 Cal.Rptr.2d 212, 954 P.2d 475] (*Musselwhite*).) Even where the People present capital charges, joinder is proper so long as evidence of each charge is so strong that consolidation is unlikely to affect the verdict. (*People v. Arias* (1996) 13 Cal.4th 92, 130, fn. 11 [51 Cal.Rptr.2d 770, 913 P.2d 980] (*Arias*); *People v. Lucky* (1988) 45 Cal.3d 259, 277-278 [247 Cal.Rptr. 1, 753 P.2d 1052] (*Lucky*).) As in those cases, the strength of the

People's evidence warrants our conclusion that the trial court properly joined the charges.[2]

■ Defendant contends the evidence of the Navarette homicide tended to inflame the jury to defendant's detriment concerning the Castro charges. Defendant argues a jury trying the Castro charges separately would not have learned about defendant's heavy gang involvement. Without expressing our agreement or disagreement with this assertion, we note it is doubtful that the evidence on the Navarette charge was so much more inflammatory than that supporting the Castro charge. The evidence supporting the former charge indicated defendant assisted Aguilar in shooting the individual who, in their minds, had shot Aguilar's brother three hours earlier, and had shot at defendant on several occasions a few weeks before. By contrast, the evidence supporting the latter charge showed defendant was the instigator and perpetrator of a killing for which the only motive was punishing Jose Castro for refusing to abandon his car on defendant's demand. We find defendant has failed to meet his burden of showing the evidence supporting either charge was so inflammatory as to create prejudice regarding the other.

We also find the People's case on both charges was sufficiently strong to render joinder proper. (*Lucky*, *supra*, 45 Cal.3d at p. 278.) Defendant contends the People's case on the Castro charges was weak, emphasizing the favorable dispositions granted to the witnesses and the alleged unreliability of Mandich's identification. Contrary to defendant's argument, we find the evidence of the Castro homicide to be comparable to, if not stronger than, the evidence of the Navarette homicide.

Defendant contends the "Castro evidence" was tainted by the favorable dispositions received by the witnesses. None of the evidence inculpating defendant on the Castro charges could have been the dubious product of favorable prosecutorial treatment. David Lozano was allowed to plead guilty to voluntary manslaughter and received a maximum sentence of 11 years, but his testimony echoed his June 4, 1990, pretrial statement, which he offered prior to his arrest and disposition in this case. Oscar Montes pleaded guilty to voluntary manslaughter pursuant to an agreement that he would receive no more than four years's imprisonment. But Montes's trial testimony was of minimal value to the People; his value as a witness derived from his tape-recorded interview of June 1, 1990, which preceded his plea. Moreover, due to the disposition accepted by two of the witnesses on the Navarette count, Walter Aguilar and Mauricio Soriano, we cannot find the

---

[2]Because we do not find that either charge was unusually likely to inflame the jury or that the evidence of either or both of the charges was "weak," we need not determine whether and to what extent the evidence of the two homicides would have been cross-admissible.

dispositions to be a meaningful basis for distinguishing the strength of the evidence on the two charges.

The People actually presented more evidence corroborating the gang members' testimony with respect to the Castro charges. The People tied both Velasquez and Soriano to the shooting through their fingerprints; no such physical corroboration supported the Navarette charge. Furthermore, David Mandich, a disinterested witness, identified defendant as the shooter, both in court and at a lineup. Although defendant naturally challenges these identifications, observing Mandich failed to identify defendant from photographs, initially identified the perpetrator as a Black male, and described the shooter's jacket as being black, Mandich's description was consistent with the statements of Montes and Lozano. Mandich correctly described the number and positioning of Castro's assailants (two, including the shooter, at the left front of the car and two at the right front), he described the location where the car was parked, he described how the shooter was talking to the driver, and then, after the shooting, how all four assailants began running. He further identified defendant's jacket, although, according to Montes, it was silver with black lettering; someone else in the party wore the black Raiders jacket. Mandich correctly described defendant's height in both absolute and relative terms. Considering the evidence as a whole, we find the evidence supporting the Castro charges was sufficiently strong to support the denial of the motion.[3]

Defendant cannot show that the evidence supporting either charge was unusually likely to inflame the jury or impermissibly weak. (*Musselwhite, supra*, 17 Cal.4th at pp. 1244-1247.) We find the trial court properly exercised its discretion in joining the charges, and defendant received his due process right to a fair trial.

### 2. *Transfer to the Northwest Judicial District*

■ Defendant challenges the trial court's transfer of the case from the Central Judicial District of the Los Angeles Superior Court to the Northwest Judicial District. He contends the transfer denied him his rights both to vicinage and a jury chosen from a fair cross-section of the community. We reject both claims.

On April 16, 1992, Judge Stephen Czuleger announced he would transfer the case from the Central Judicial District to the Northwest Judicial District

---

[3]The evidence supporting the Navarette charge was also convincing. Both defendant's statement and those of his passengers showed he drove the truck. The testimony of disinterested witnesses Rudolfo Rivera and Carlos Montes further confirmed the driver accelerated and maneuvered the truck in a way that facilitated the shooting and escape.

on April 21. Defendant moved to impanel prospective jurors from the Central Judicial District to provide him with a jury drawn from a representative cross-section of the community. Defendant further moved to quash the Northwest Judicial District jury panel, alleging a systematic exclusion of minority jurors.

Defendant based the motion to quash on demographic evidence, including the testimony of Juanita Blankenship, the administrator of litigation support services for Los Angeles County Superior Court, and social demographer Dennis Willigan. The trial court rejected the motion. The court found transfer was authorized by *Hernandez v. Municipal Court* (1989) 49 Cal.3d 713 [263 Cal.Rptr. 513, 781 P.2d 547] (*Hernandez*). The trial court rejected defendant's allegation of systematic exclusion, basing its analysis on *Duren v. Missouri* (1979) 439 U.S. 357 [99 S.Ct. 664, 58 L.Ed.2d 579] (*Duren*). The trial court properly denied the motion.

As the trial court correctly observed, *Hernandez* authorizes intracounty transfer of cases. In *Hernandez*, we held the boundaries of vicinage are coterminous with the boundaries of the county. (*Hernandez, supra*, 49 Cal.3d at p. 729.) Accordingly, *Hernandez* decided "there is no violation of the vicinage requirement when a criminal defendant is tried in Los Angeles County by a jury drawn from Los Angeles County" (*id.* at p. 722), and we decline defendant's request to reconsider that conclusion. Furthermore, as we recently held in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1065 [108 Cal.Rptr.2d 409], the Sixth Amendment right to vicinage was not incorporated by the Fourteenth Amendment against the states, and thus the transfer implicates no federal constitutional right.

■ The trial court also properly concluded defendant failed to establish a prima facie violation of his right to a jury drawn from a fair cross-section of the community. ■ " 'In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' " (*People v. Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315], quoting *Duren, supra*, 439 U.S. at p. 364 [99 S.Ct. at p. 668].) ■ The trial court determined defendant satisfied only the first prong of this test.

We have recognized that Hispanics are a cognizable group. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1154 [64 Cal.Rptr.2d 892, 938 P.2d 950]

(*Ramos*); *People v. Sanders* (1990) 51 Cal.3d 471, 491 [273 Cal.Rptr. 537, 797 P.2d 561] (*Sanders*).)

Whether defendant satisfies the second prong is less certain. The evidence presented revealed that although 13 percent of the jury-eligible population of the Northwest Judicial District was Hispanic, only 7.7 percent of the district's jury pool in May and June 1992 was Hispanic. This resulted in an "absolute disparity" of 5.3 percent, and a "comparative disparity" of approximately 40.8 percent.[4] Neither we nor the United States Supreme Court has decided which test better measures alleged violations of the cross-section right or what degree of disparity is impermissible. (*Ramos*, *supra*, 15 Cal.4th at p. 1155.) We need not decide either question here, because defendant clearly failed to satisfy *Duren*'s third prong.

The third prong requires defendant to show the state selected the jury pool in a constitutionally impermissible manner that was the probable cause of the disparity. (*People v. Bell* (1989) 49 Cal.3d 502, 524 [262 Cal.Rptr. 1, 778 P.2d 129] (*Bell*).) The evidence presented below showed Los Angeles County had formerly relied on voter registration lists to compile its jury pools, and added Department of Motor Vehicles records in the early 1980's to provide a more representational list. We have observed that Code of Civil Procedure section 197 prescribes that a list derived from voter and driver records " 'shall be considered inclusive of a representative cross-section of the population' " where it is properly nonduplicative. (*Sanders*, *supra*, 51 Cal.3d at p. 496, fn. 9.)

Defendant now contends the county's failure to supplement these two lists with other "readily available lists" demonstrates the systematic exclusion required by *Duren*. This claim fails because the United States Constitution "forbids the *exclusion* of members of a cognizable class of jurors, but it does not require that venires created by a neutral selection procedure be supplemented to achieve the goal of selection from a representative cross-section of the population." (*Bell*, *supra*, 49 Cal.3d at p. 530.) As the United States Fourth Circuit Court of Appeals has explained, the failure of a particular group to register to vote in proportion to its share of the population cannot constitute improper exclusion attributable to the state. (*United States v. Cecil* (4th Cir. 1988) 836 F.2d 1431, 1448-1449.) So long as the state uses criteria

---

[4]Courts calculate the "absolute disparity" by subtracting the proportion of the underrepresented group in the pool (figure B) from the underrepresented group's proportion of the population (figure A). (*People v. Breaux* (1991) 1 Cal.4th 281, 297, fn. 3 [3 Cal.Rptr.2d 81, 821 P.2d 585].) In this case, subtracting 7.7 percent from 13 percent yields 5.3 percent. Courts calculate the comparative disparity by dividing the absolute disparity by figure A and multiplying the result by 100. (*Ibid.*) In this case, dividing 5.3 percent by 13 percent yields .4077, which produces a comparative disparity of 40.77 percent.

that are neutral with respect to the underrepresented group, a defendant cannot satisfy *Duren's* third prong by showing the state could have adopted other measures to improve further the group's representation. (*People v. Currie* (2001) 87 Cal.App.4th 225, 235-237 [104 Cal.Rptr.2d 430].) The challenged state action must be the probable *cause* of the disparity (*Bell*, at p. 524); defendant has pointed only to the state's inability to provide a *remedy*. Without more, defendant's claim challenging the Los Angeles County Northwest Judicial District jury pool must fail.

### 3. *Voir Dire Questions and Challenges for Cause*

 Defendant contends the prosecutor offered misleading descriptions of the case on voir dire, which led to the erroneous exclusion of jurors for cause. He contends these jurors offered responses that appeared to call into question their ability to keep an open mind as to penalty only because the prosecutor characterized the facts of the case as being relatively benign for a capital case. The result of this allegedly improper characterization, defendant argues, was a jury predisposed to impose death under the particular circumstances of this case. We conclude both the questioning and the excusals were proper.

#### a) *Prospective Jurors Gertrude W., Patrice V. and Alicia B.*

After the court asked the panel some questions, the defense commenced its voir dire by noting some people believe only individuals like Adolf Hitler or Jeffrey Dahmer deserve death. The trial court sustained the prosecutor's objection to defense counsel's asking a prospective juror whether she could vote to execute Hitler or Dahmer. The prosecutor used her voir dire to explain, without objection, the concepts of accomplice liability and the felony-murder doctrine. When asked, Prospective Juror Gertrude W. confirmed she would not impose the death penalty in a case, like the instant one, where the defendant did not personally commit one of the murders, and did not plan or premeditate the other. She told the court, "I don't think I would consider voting for death." The court excused Prospective Juror Gertrude W. for cause.

At the conclusion of the first panel's voir dire, the trial court remarked the first questioning went very smoothly. Neither party disagreed with this characterization. With respect to future panels, the court warned the defense not to ask whether jurors would favor the death penalty for individuals such as Jeffrey Dahmer or Charles Manson, but instead to limit its inquiry to the facts of the instant case. The court likewise cautioned the prosecutor not to ask prospective jurors if they could impose the death penalty for an unintentional felony murder, since there was a second, intentional murder charged.

Thereafter, the court questioned Prospective Juror Patrice V., who noted on her questionnaire her belief that "the death penalty was state sanctioned murder." She stated that "[i]t would be very difficult" for her to sentence someone to death. She thought she could set aside her personal feelings if she received "very clear instructions about what my obligation was." Prospective Juror Alicia B. stated she did not "fully agree with the death penalty." The prosecutor described the general principles of accomplice liability and felony murder. She asked prospective jurors whether they could return a death verdict if, in one of the charged murders, defendant did not personally shoot the victim, and, in the other, defendant neither planned nor premeditated the murder.

Upon inquiry, Prospective Juror Patrice V. confirmed she considered the death penalty "state sanctioned murder." Patrice V. agreed she "would not consider the death penalty in this type of case." Prospective Juror Alicia B. confirmed she did not really agree with the death penalty. She did not feel she would consider death as a possible penalty, as this was not "the right kind of case" for capital punishment. The court later followed up the prosecutor's questions by asking whether Alicia B. would consider voting for death if she heard about defendant's prior violent misconduct during the penalty phase. Prospective Juror B. answered, "This is my position. That this case is not the case for [the] death penalty," no matter what evidence the People presented during the penalty phase. The trial court excused both Prospective Jurors Alicia B. and Patrice V. for cause.

After a brief recess, the defense expressed its concern that the court precluded defense questions about capital punishment in the Dahmer or Manson cases, yet allowed the prosecutor to use a "misleading nonegregious hypothetical when questioning those same jurors." The court reiterated its ban on the defense's Hitler/Dahmer/Manson inquiries, and noted the prosecutor had offered her hypotheticals without timely objection. The court found it "fair for the prosecutor to point out [that a felony] murder may be accidental, nonintentional or it may be intentional as well." For future questioning, the court granted the defense some "rebuttal" voir dire after the prosecutor had finished. The defense announced its intention to ensure the hypotheticals accurately described the evidence in the case.

Because there had been no objection, the court refused to revisit any of the excusals the court had already allowed. The court stated its belief, however, that "almost all of [the jurors excluded on the People's motion] were what we would call *Witherspoon* [*v. Illinois* (1968) 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776]] excludables. Most, if not all, were those that were adamantly opposed and would not impose [the death penalty under] any circumstances."

### b) *Prospective Jurors Linda H., Martha C., Arthur R. and Lynn J.*

During the trial court's inquiry, Prospective Juror Linda H. announced, "I'm against the death penalty." She agreed, however, she could set aside her personal opinion in serving as a juror. After describing the aiding and abetting and felony-murder doctrines, the prosecutor asked about Linda H.'s questionnaire comment that "when a jury sentences someone to death, it's murder." Ms. H. confirmed her opposition, stating, "I'm against the death penalty always." She stated she could not vote for death "in any case." The court excused her for cause.

During the trial court's inquiry of a later panel, the court asked Prospective Juror Martha C. about her questionnaire comment that, given the choice, she would always vote for life imprisonment without possibility of parole. She answered she did not think she could envision any set of circumstances that would prompt her to vote for death. Ms. C. also confirmed her questionnaire remark that if she sentenced someone to death, she would feel guilty for the rest of her life. She later told the prosecutor she did not think she could impose a sentence of death "regardless of the evidence in this case."

After hearing the prosecutor's description of aiding and abetting liability, Prospective Juror Arthur R. volunteered he would have a difficult time finding an aider and abettor guilty of first degree murder, and he could do so only where it was "pretty clear that the person was really connected." Mr. R. admitted he was not sure whether he could vote for death, "regardless of the evidence in this case." He stated, "I rather feel that I would be inclined to not [impose a death sentence]." When asked further whether he could vote for death "if you felt it was appropriate," he thought he would "not [be] able to follow through."

Prospective Juror Lynn J. volunteered he thought it might be best to limit capital punishment to premeditated and deliberate murders. When later questioned, Mr. J. confirmed his questionnaire statement that the death penalty should be limited to cases of mass murder, unusual cruelty, torture or murder while in prison. When asked if he could nevertheless vote for death in the instant case, which did not involve such factors, he answered affirmatively. When the prosecutor asked whether he could consider death as a penalty considering "what you know about this case," the trial court sustained defendant's objection. Mr. J. averred he could vote for death "if it involves torture or some activity that's at the highest level of crime." Upon further inquiry, Mr. J. agreed that neither murder in the commission of an attempted robbery nor murder by aiding and abetting met his standards for

imposing death. Accordingly, he did not believe he could consider voting for death in this case. The trial court excused Prospective Jurors Martha C., Arthur R. and Lynn J. for cause.

c) *Analysis*

█ Trial courts excuse for cause a juror whose views on capital punishment would " ' "prevent or substantially impair" ' " the performance of the juror's duties. (*Morgan v. Illinois* (1992) 504 U.S. 719, 728 [112 S.Ct. 2222, 2229, 119 L.Ed.2d 492]; *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841] (*Wainwright*); *Bradford, supra,* 15 Cal.4th at p. 1318.) The real question is " ' "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror.*" ' " (*Bradford,* at pp. 1318-1319, quoting *People v. Hill* (1992) 3 Cal.4th 959, 1003 [13 Cal.Rptr.2d 475, 839 P.2d 984].) A juror is subject to exclusion for cause if she "would invariably vote either for or against the death penalty because of one or more circumstances likely to be present in the case being tried, without regard to the strength of aggravating and mitigating circumstances . . . ." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248] (*Kirkpatrick*).)

█ To facilitate the intelligent exercise of both peremptory challenges and those for cause, parties may inform prospective jurors of the general facts of the case. (*People v. Ervin* (2000) 22 Cal.4th 48, 70 [91 Cal.Rptr.2d 623, 990 P.2d 506] (*Ervin*); *Kirkpatrick, supra,* 7 Cal.4th at pp. 1004-1005.) A prosecutor may therefore inquire whether a juror will be able to impose the death penalty on a defendant who commits felony murder (*People v. Pinholster* (1992) 1 Cal.4th 865, 916-918 [4 Cal.Rptr.2d 765, 824 P.2d 571]), or on a defendant who did not personally kill the victim. (*Ervin,* at pp. 70-71.) The trial court properly exercised its broad discretion in allowing the prosecutor's voir dire. (*Pinholster,* at p. 918.) To the extent a more accurate characterization of the case was possible, defendant had the opportunity to provide it. The trial court correctly found defendant had waived any challenge to the prosecutor's questioning by failing to offer a timely objection. (*People v. Medina* (1995) 11 Cal.4th 694, 740 [47 Cal.Rptr.2d 165, 906 P.2d 2] (*Medina*).) Even after receiving the court's advice about the need for timely objection, defendant failed to object to ensure that the prosecutor offered a more accurate description of the case. Where defendant offered a proper objection, the trial court sustained it. Furthermore, the trial court expressly indicated it would not dismiss for cause a prospective juror who

based her stated inability to impose the death penalty on a description of the case that the court deemed misleading.[5]

We uphold both the questioning and the excusals. If a juror's responses are equivocal or conflicting, the trial court's determination of the juror's fitness to serve is binding. (*People v. Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865].) If there is no inconsistency, we uphold the determination below if it is supported by substantial evidence. (*Ibid.*) In other words, only if the record discloses no evidence from which a rational trier of fact could find a juror was qualified to serve will we find error. Prospective Juror Linda H.'s comments revealed her unambiguous opposition to the death penalty, and the trial court properly excused her. Substantial evidence likewise supports the exclusion of the other jurors. To the extent their responses could support multiple inferences, we defer to the trial court's determination of their unfitness to serve. (*Ibid.*)

### 4. *Peremptory Challenges Against Death Penalty Skeptics*

■ Defendant contends the prosecutor committed reversible error in exercising peremptory challenges against four prospective jurors who expressed skepticism about capital punishment, even though they were qualified to serve in accordance with *Witherspoon v. Illinois, supra,* 391 U.S. 510 and *Wainwright, supra,* 469 U.S. 412. Defendant did not object to these challenges, and thus failed to preserve the issue for appeal. (*People v. Champion* (1995) 9 Cal.4th 879, 907 [39 Cal.Rptr.2d 547, 891 P.2d 93] (*Champion*).)

Furthermore, these challenges were proper. We have distinguished between the impermissible practice of excluding jurors based on their membership in a racial or ethnic group and the permissible practice of excluding jurors based on their attitudes or viewpoints. (*People v. Turner* (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on another ground in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115 [240 Cal.Rptr. 585, 742 P.2d 1306].) Because both parties may exercise peremptory challenges to remove jurors with unfavorable attitudes, the practice does not produce a jury biased toward death. (*Turner*, at p. 315.) We therefore

---

[5]The prosecutor asked Prospective Juror Doris K., "Knowing what you know now about this case . . . it doesn't necessarily involve premeditation and deliberation, especially with respect to the robbery murder. [¶] . . . [W]ould it be fair to say that as you sit here today you don't see yourself actually imposing a sentence of death?" Defendant objected. The court reminded the prosecutor the People alleged the Navarette murder was premeditated. The court further found the prosecutor had omitted any reference to any aggravating evidence. Although the court declined to restrict the prosecutor's voir dire, the court thrice stated it would not dismiss Prospective Juror Doris K. for cause on this record.

permit prosecutors to exercise peremptory challenges against prospective jurors who express skepticism about capital punishment. (*People v. Bolin* (1998) 18 Cal.4th 297, 317 [75 Cal.Rptr.2d 412, 956 P.2d 374] (*Bolin*); *Champion, supra,* 9 Cal.4th at p. 907.)

### 5. *Defendant's Absence from Sidebar Conferences*

The trial court inquired of 12 prospective jurors who had marked on their juror questionnaires "confidential" regarding specific questions. Two of these jurors, Raymond F. and Cecil H., eventually served on the jury. The prosecutor and both counsel were present at these sidebar conversations. Defendant neither asked to participate nor objected to his absence. He now contends his absence deprived him of his right to be present at trial, which is protected by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, article I, section 15 of the California Constitution, Penal Code sections 977 and 1043, and common law.

### a) *Constitutional law*

A criminal defendant's federal constitutional right to be present at trial, largely rooted in the confrontation clause of the Sixth Amendment, also enjoys protection through the due process clause of the Fifth and Fourteenth Amendments (*United States v. Gagnon* (1985) 470 U.S. 522, 526 [105 S.Ct. 1482, 1484, 84 L.Ed.2d 486] (*Gagnon*)) " 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge,' " but not " 'when presence would be useless, or the benefit but a shadow.' " (*Kentucky v. Stincer* (1987) 482 U.S. 730, 745 [107 S.Ct. 2658, 2667, 96 L.Ed.2d 631], quoting *Snyder v. Massachusetts* (1934) 291 U.S. 97, 105-107 [54 S.Ct. 330, 332-333, 78 L.Ed. 674, 90 A.L.R. 575].) Article I, section 15 of the California Constitution applies the same standard. (*People v. Waidla* (2000) 22 Cal.4th 690, 742 [94 Cal.Rptr.2d 396, 996 P.2d 46] (*Waidla*).)

Defendant has not indicated any way in which his presence at the sidebar conferences bore a reasonably substantial relation to his opportunity to defend himself. He admits the impossibility of knowing what sudden impressions and unaccountable prejudices he might have formed. Because there must be a "reasonably substantial relation" to defendant's ability to defend himself, and not a mere "shadow" benefit, we must reject such claims based on undue speculation. (*Waidla, supra,* 22 Cal.4th at p. 742; *People v. Johnson* (1993) 6 Cal.4th 1, 19 [23 Cal.Rptr.2d 593, 859 P.2d 673] (*Johnson*).)

In *Johnson*, the trial court held a sidebar conference during trial to determine whether a juror should have been dismissed. Evidence showed the

juror had (1) nodded and " 'consistently smiled' at defendant, 'to the extent that [his] teeth [were] showing' "; (2) frequently greeted defendant before lunch breaks; (3) concealed a prior arrest for narcotics possession; and (4) apparently failed to pay attention or slept during proceedings. (*Johnson, supra*, 6 Cal.4th at pp. 16-17.) After the in camera hearing, which neither the prosecutor nor defense counsel attended, the court excused the juror for the latter two reasons. In *Johnson*, unlike the instant case, some of the questions raised at the conversation from which the defendant was absent concerned activity in which he was personally involved and would have personal, possibly exclusive knowledge.[6] We rejected Johnson's allegation that he was improperly excluded (even though Johnson both objected to the hearing on the juror's fitness and requested to be present) because we deemed his claim that he "might have helped his counsel" too speculative to show his presence bore a reasonably substantial relation to his ability to defend against the charges. (*Johnson*, at pp. 18-19.) A fortiori, we must reject defendant's instant contention.

b) *Statutory law*

Defendant further contends his absence deprived him of his statutory and common law rights. We have observed that both the United States Constitution and the California Penal Code do not follow the common law on this subject. (*People v. Grant* (1988) 45 Cal.3d 829, 845 [248 Cal.Rptr. 444, 755 P.2d 894].) Insofar as the statutory right is concerned, we have recognized its relation to the constitutional right. In *Ervin, supra*, 22 Cal.4th at page 74, we stated that where the proceeding bears no reasonable relation to defendant's ability to defend against the charges, sections 977 and 1043 do not *require* defendant's presence. In *Waidla, supra*, 22 Cal.4th at page 742, we stated those sections do not *entitle* a defendant to be present where the constitutional standard has not been met. Although we find the constitutional standard has not been met here, we analyze the issue to place our prior statements in their proper context.

We have long recognized a hierarchy of proceedings concerning the need for the defendant's presence. In *People v. Jackson* (1980) 28 Cal.3d 264 [168

---

[6]The confidential sidebar conferences here concerned past criminal behavior on the part of the prospective jurors, their friends or relatives, the criminal victimization of a relative, the possible professional hardship imposed by jury service, participation in Overeaters Anonymous, psychological issues regarding whether a prospective juror was a leader or follower, the Rodney King case, religious questions concerning capital punishment, and concern about the confidentiality of identities of jurors and their posttrial security. The one prospective juror who commented on defendant personally, indicating his failure to look at jurors suggested his guilt, was excused for cause by the court on its own motion, which was at the defendant's "request."

Cal.Rptr. 603, 618 P.2d 149], we cited section 977's provisions that a defendant could not waive presence for certain fundamental proceedings (arraignment, plea, preliminary hearing, the taking of evidence by the trier of fact, and sentencing), but could waive presence for " 'all other proceedings.' " (*Jackson*, at p. 309.) We further observed a third category; unlike the first two categories, the fundamental and " 'all other' " proceedings, for which a defendant was entitled to be present, we noted "the accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' " (*Ibid.*)

We reiterated these categories in *People v. Holt* (1997) 15 Cal.4th 619, 706 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*). We recalled that section 977 requires a defendant to be present at the five fundamental proceedings and entitles him to be present at all others. We added, however, "that neither [section 977] nor the constitutional right to be present at trial extends to chambers or bench discussions outside the presence of the jury when those matters do not bear a reasonably substantial relation to the opportunity to defend." (*Holt*, at p. 706.) We evaluated the sidebar and in-chambers discussions at issue in *Holt*, and concluded, "Since his presence at [those] proceedings was not necessary to protect his interests, assure him a fair and impartial trial, or assist counsel in defending the case, there was no error" in excluding Holt from the proceedings. (*Id.* at pp. 706-707.)

*Holt* and *Jackson* illuminate our statements in *Ervin* and *Waidla*. In proceedings that are not in chambers or at sidebar, a defendant is entitled (but not required) to be present. (*Ervin, supra*, 22 Cal.4th at p. 74.)[7] On the other hand, for those proceedings that are beyond the scope of section 977, defendants do not have a right to be present unless the constitutional standard has been met. (*Waidla, supra*, 22 Cal.4th at p. 742.)

There are sound public policy reasons why a defendant has a lesser interest in personal presence when the jury is also not present. (Cf. *People v. Hovey* (1988) 44 Cal.3d 543, 573 [244 Cal.Rptr. 121, 749 P.2d 776].) When a prospective juror seeks a confidential exchange with the court, allowing the defendant to be present "could well undermine the confidence and cooperation" necessary. (*Ibid.*) In light of one juror's concern about posttrial safety, allowing defendant to be present would have been "counterproductive" (*Gagnon, supra*, 470 U.S. at p. 527 [105 S.Ct. at p. 1485]); the juror

---

[7]Of course, if the defendant's presence does not bear a reasonable relationship to his ability to defend, an erroneous exclusion may well be harmless. (*People v. Medina* (1990) 51 Cal.3d 870, 902-903 [274 Cal.Rptr. 849, 799 P.2d 1282].)

may have declined to share his concerns, remained on the jury, and allowed his concerns to incline him toward finding defendant guilty. Instead, the juror candidly acknowledged that his security concerns made him "partial towards the prosecution," and was dismissed from jury service. We therefore follow *Holt* and decline to extend the statutory right to personal presence to such confidential proceedings.

### 6. *The Motion to Suppress*

 Detective Coulter interviewed defendant on the morning of January 22, 1990, after Detective Bercham had advised defendant of his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].) Detective Coulter considered defendant to be a possible witness but not a suspect in either the Navarette or Castro murders. Later that evening, Detective Coulter asked defendant to show him the residence of a suspect in a different case. The detective did not remind defendant of his *Miranda* rights. The detective taped their evening conversation, which disclosed evidence of the gang warfare between the 18th Street Gang and the Crazy Riders, but did not establish anything regarding the Navarette or Castro murders. When asked if the shooting of the white car with license plate No. "2MTY" (Navarette) was in retaliation for a Crazy Riders shooting, defendant answered, "I know that they could have probably confused them, but I have heard nothing about it."

Defendant moved to suppress the evening statement as the unlawful product of a custodial interrogation that was not preceded by a *Miranda* advisement. Defendant contended the detective was already aware of the gang rivalry between the 18th Street Gang and the Crazy Riders and of defendant's involvement with the 18th Street Gang. The trial court denied the motion to suppress. It held that Detective Coulter considered defendant to be only a possible witness on the Navarette and Castro murders, and the interview was not a custodial interrogation for *Miranda* purposes. The court further found the morning advisement adequately informed defendant of his constitutional rights and no readvisement was necessary.

 We accord deference to the trial court's factual findings, upholding all that are supported by substantial evidence. We independently determine from the facts whether the challenged statement was unlawfully obtained. (*Johnson, supra,* 6 Cal.4th at p. 25.) Substantial evidence supports the conclusion that the evening interview was not an interrogation for *Miranda* purposes. Other than the question cited above, the interview did not concern the Castro or Navarette murders. Detective Coulter questioned defendant about other suspects, asking defendant, "Who *else* besides you has

the license number of this white Toyota that [Crazy Riders] had been driving
. . . ?" We find the evening interview was not reasonably likely to elicit an incriminating response. (*People v. Wader* (1993) 5 Cal.4th 610, 637 [20 Cal.Rptr.2d 788, 854 P.2d 80].)[8]

Furthermore, any error was harmless beyond a reasonable doubt. (*People v. Cahill* (1993) 5 Cal.4th 478, 510 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) The statement had minimal value to the People's case on the Navarette count and no value on the Castro counts, whereas the People offered compelling cases for conviction with their other evidence. In short, we find beyond a reasonable doubt that the exclusion of the challenged statement would not have affected the outcome at trial.

### 7. Defendant's "187" Tattoo

■■■ Detective Bercham testified about defendant's tattoos. He explained the extent of defendant's 18th Street Gang tattoos signified his "hard-core" member status. The detective further testified defendant had on his forehead a tattoo of the number "187," the California Penal Code section proscribing murder, which had been added after the charged homicides occurred. After an Evidence Code section 402 hearing, the trial court overruled defendant's objections that evidence of the tattoo was unduly prejudicial within the meaning of Evidence Code section 352 and that Detective Bercham was not qualified to offer an expert opinion about the tattoo's significance. The trial court found the "187" tattoo highly probative, as it could be viewed as an admission of defendant's guilt. The court found it highly unlikely that an innocent person would obtain such a tattoo, and ruled the jury could conclude defendant displayed the tattoo as a badge of honor. Defendant reiterates his objection on appeal.[9]

■■■ Trial courts exercise discretion in determining both the admissibility of evidence under Evidence Code section 352 (*People v. Kipp* (1998) 18 Cal.4th 349, 371 [75 Cal.Rptr.2d 716, 956 P.2d 1169]) and a witness's expert status (*Bolin, supra*, 18 Cal.4th at pp. 321-322). The exercise of discretion is not grounds for reversal unless " 'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a

---

[8]Because we find defendant's conversation was not an interrogation, and thus no advisement was necessary, we need not evaluate the trial court's determination that the morning advisement sufficed.

[9]Defendant now raises numerous state and federal constitutional grounds for error. The Attorney General contends these grounds were not preserved for appeal. As our analysis of alleged evidentiary error generally does not depend on whether the defense attaches the violation to the federal Constitution (see *People v. Cudjo* (1993) 6 Cal.4th 585, 611-612 [25 Cal.Rptr.2d 390, 863 P.2d 635]), we need not determine whether defendant preserved these grounds.

manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*), quoting *People v. Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79].) We find the trial court properly exercised its discretion both in admitting the tattoo into evidence and in permitting Detective Bercham to provide expert testimony describing the tattoo's significance.

The trial court properly found the tattoo represented an admission of defendant's conduct and a manifestation of his consciousness of guilt. The court reasonably considered the tattoo highly probative, as it would be unlikely that an innocent person would so advertise his connection to murder. Defendant contends the admission was ambiguous, as he could have been highlighting his connection to the 18th Street Gang's Seventh Street subgroup. Such argument concerns only the weight of this evidence, not its admissibility, which does not require complete unambiguity. In *Kraft, supra,* 23 Cal.4th at pages 1032-1036, we approved the admission of a coded list that arguably referred to a series of homicides committed by the defendant. We rejected the defense claim that the evidence was unduly speculative in that it "required interpretation to be understood by a reader." (*Id.* at p. 1035.) We further found any error in admitting the list harmless, as the jury would not accord weight to the list unless it found it was an admission of guilt as argued by the People. (*Ibid.*) Our analysis in *Kraft* leads us to reject defendant's Evidence Code section 352 objection to the admission of his "187" tattoo.

We likewise find the trial court properly exercised its discretion in permitting Detective Bercham to testify as an expert concerning defendant's gang-related tattoos, including the "187" mark. The Evidence Code authorizes a witness to testify as an expert "if he has special knowledge, skill, experience, training, or education sufficient" to qualify as an expert, "[r]elated to a subject that is sufficiently beyond common experience that the [expert] opinion . . . would assist the trier of fact." (Evid. Code, §§ 720, 801.) The detective testified he received training on gangs when he attended the police academy, and has since attended gang awareness school. He further testified that for most of the past 11 years and all of the past seven he has investigated street gangs and the crimes they commit.

The detective noted "187" was the California Penal Code section that proscribed murder. We have observed the culture and habits of criminal street gangs are not matters within common knowledge for Evidence Code section 801 purposes (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713]), and have therefore approved expert testimony to describe the significance of gang graffiti and hand signs. (*Champion, supra,* 9 Cal.4th at pp. 919-924.) Just as the expert witness in *Champion* could testify as to the significance of specific symbols of graffiti

without ascertaining the subjective intent of the graffiti's author, Detective Bercham could testify as to the significance of the "187" tattoo without obtaining defendant's statement on the subject. Furthermore, considering the tattoo itself was admissible, and the strength of the People's overall case, we conclude any error in admitting the detective's expert opinion was surely harmless.

### 8. Defendant's Prior Bad Acts

Defendant contends the trial court committed reversible error (1) by informing the jury, and permitting the People to inform the jury, of defendant's prior bad acts; and (2) by allowing Detective Bercham to imply defendant had served time in prison. Defendant contends these errors deprived him of a myriad of constitutional rights, including the right to a fundamentally fair trial. The record belies these claims.

The trial court and the People examined several prospective jurors on voir dire to determine whether they could impose a death sentence. The court sought to ascertain whether the prospective jurors' minds would remain open until the penalty phase, when both the People and the defense could introduce evidence about defendant's background. Accordingly, the court asked prospective jurors whether they would consider such information. Defendant cites, for instance, the following examination: "Would you take into account the background information in determining whether or not the punishment was appropriate[?] [¶] The background information may be, on the one hand, bad things about the defendant. Say a prior conviction or prior act of violence, something like that. [¶] On the other hand, it might be something favorable. Good deeds he's done, people he's helped, things he can do within the prison system that might be beneficial to others. [¶] Would you be willing to consider that and give it whatever weight you thought was appropriate?" The court later inquired: "So if you heard evidence of two murders—I'm not saying any of this is going to happen, but if there was evidence of two murders and the prosecutor had all kinds of bad evidence about the defendant, and you conclude this guy is a rotten apple and we are better off without him, you couldn't vote for death under any circumstances?" When the juror responded, "No," the court reiterated the hypothetical nature of the inquiry: "I don't want the jurors to get the wrong idea. I have no idea what evidence would be presented in the penalty phase. I'm just throwing these things out for purposes of the question."

The court carefully explained the inquiry was hypothetical, and the court had no knowledge of any specific misconduct on defendant's part. We therefore reject defendant's contention that this and similar inquiries prejudicially informed the jury that defendant had committed prior bad acts.

Defendant's assignment of reversible error to Detective Bercham's testimony is likewise meritless. When the prosecutor asked the detective to describe a particular tattoo of defendant's, Detective Bercham noted it was very common and people often obtained it while in prison. After the defense objected, the court ruled, "Why don't we just clarify that. [¶] You don't have any reason to believe that was done in prison?" Detective Bercham agreed, "No, I don't know where this was done." The trial court properly restricted the detective from implying defendant had served time in state prison. No error occurred.

### 9. *The Continuance*

 In July 1992, the prosecutor requested not to have any court proceedings during the week of August 17-21, 1992, apparently because she had a planned vacation. Although the prosecutor preferred to delay the start of trial until August 24, the trial court ruled that a delay would impede the court's retention of jurors. The court instead preferred to begin on August 10, allowing the jury a break in the middle of an expected three-week trial. The defense did not object to this schedule.

Defendant now contends this break of five court days, and nine total days,[10] violated numerous constitutional provisions.[11] In *People v. Johnson* (1993) 19 Cal.App.4th 778 [23 Cal.Rptr.2d 703], another capital case,[12] the parties agreed to give the jury a recess, for nine court days and 17 calendar days, for the December holiday season. (*Id.* at p. 792.) The Court of Appeal, following *People v. Harris* (1977) 73 Cal.App.3d 76, 83 [140 Cal.Rptr. 697], held the defense's failure to object waived the issue on appeal. (*People v. Johnson, supra*, 19 Cal.App.4th at p. 794.) Defendant's failure to object likewise waives the instant claim.

Defendant cites *People v. Santamaria* (1991) 229 Cal.App.3d 269 [280 Cal.Rptr. 43] (*Santamaria*), which includes a footnote indicating "the court's abuse of discretion here was of such magnitude that whether or not appellant objected is irrelevant." (*Id.* at p. 279, fn. 7.) The *Santamaria* opinion, however, did not purport to abrogate the duty to object generally. On its

---

[10]The court adjourned on Friday, August 14, to give the defense additional preparation time.

[11]Specifically, defendant alleges violations of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and violations of article I, sections 1, 7, 15, 16, and 17 of the California Constitution. With the exception of *Hicks v. Oklahoma* (1980) 447 U.S. 343 [100 S.Ct. 2227, 65 L.Ed.2d 175], which he cites in support of "an additional due process violation," defendant's argument relies entirely on California cases.

[12]The jury convicted defendant and returned a death sentence, but the trial court modified the punishment to life imprisonment without possibility of parole. (*People v. Johnson, supra*, 19 Cal.App.4th at p. 780.)

facts, it found the court's abuse was so great as to warrant appellate relief notwithstanding the absence of objection. The facts of *Santamaria* differ markedly from those here, and it therefore does not govern our analysis.

The *Santamaria* trial court adjourned the trial during jury deliberations for 10 calendar days, six of which would have otherwise been court days. (*Santamaria, supra*, 229 Cal.App.3d at p. 275.) The court planned to be away that week, and refused the People's request to transfer the matter to another judge, who could have presided over the deliberations, as provided by section 1053. (*Santamaria*, at p. 278.) The Court of Appeal, in finding the trial court abused its discretion, emphasized the timing of the delay. "It cannot be overemphasized that this prolonged and unwarranted interruption came at the most critical period in the trial. . . . [¶] . . . [¶] Had the adjournment occurred in midtrial, [counsel's] recapitulation of the evidence during argument might have nullified or minimized the effect of the delay on the jurors' recall." (*Id.* at pp. 281-282.) The timing of the delay, and the disregard for the requested alternative of a substitute judge, distinguish *Santamaria* from the instant case.

Defendant also relies on *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14, 20 [172 Cal.Rptr. 474]. Although the opinion does not fully record the procedural facts, it indicates the court shut down for three weeks, rather than one. The *Engleman* trial court also ignored section 1053. Accordingly, *Engleman* is likewise inapposite. We therefore conclude the defense's acquiescence in the continuance has waived this issue on appeal. (*People v. Johnson, supra*, 19 Cal.App.4th at pp. 792-794.)

### 10. *The Prosecutor's Closing Argument*

Defendant alleges three instances of prosecutorial misconduct during closing argument, which he contends violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution. We reject all three allegations.

### a) *The jacket*

Defendant first objects to the following statement: "[W]e know that the defendant was wearing a Raider's jacket on January 22. [¶] Whether Mr. Montes believed it was a white jacket or silver jacket, it really doesn't matter. [¶] We also know that according to David Mandich, that the defendant or the shooter was wearing some kind of team jacket. Whether it was a silver jacket, a dark blue jacket or black jacket, I don't think really matters, because we don't know beyond any doubt really what color this jacket

contained in People's 16 looked like to David Mandich the night the murder happened. [¶] And we don't know whether the defendant was really wearing the jacket in People's 16 the night of the murder. [¶] We just know that two nights later he was wearing . . . ." The trial court overruled defendant's objection, and the prosecutor moved to a different subject.

Defendant contends the prosecutor knowingly falsified facts to protect what defendant deems the Achilles' heel of the case—David Mandich's identification of defendant. Oscar Montes testified that defendant wore a white or silver Raiders jacket both on the night of the Castro murder and the day he was arrested. Mandich initially told Detective Coulter the shooter wore a dark athletic jacket with lettering on the back. According to defendant, Mandich's incorrect description of the color of the jacket threatened to undermine the People's case. The prosecutor, defendant argues, therefore mischaracterized the time when defendant was arrested, stating it was two nights after the shooting, on January 22, rather than the afternoon of January 21. This mischaracterization, defendant asserts, weakened the inference that Mandich had misidentified the shooter.

This allegation fails for several reasons. First, the obvious import of the prosecutor's statement was that Mandich's correct observation that the shooter wore a team jacket with lettering was more significant than his error regarding its color, especially considering Detective Coulter's testimony that the satin-like jacket could have looked darker on the night of the shooting. Second, whether the prosecutor characterized the date of defendant's arrest as January 21 or 22 had little bearing on the accuracy of Mandich's identification. If defendant had access to only one Raiders jacket, Mandich's description was no more accurate if the date of the arrest were January 22 instead of January 21. If defendant had a second Raiders jacket, he could have just as easily worn it on January 21 as he could have worn it on January 22. Furthermore, there is no reasonable probability that defendant would have received a more favorable result absent this isolated comment. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756] (*Stansbury*).)

b) *Defendant's placement of the gun*

Defendant also challenges the prosecutor's remark, "There was no reason for that gun to come back out and go to the head of Mr. Castro and for that gun to be fired, other than the fact that the defendant is a cold-blooded killer who didn't get what he wanted, when he wanted it, when he put a gun to the head of a man seated in a car that he wanted to take." Defendant failed to object and preserve this claim for appeal. (*People v. Hart* (1999) 20 Cal.4th

546, 619 [85 Cal.Rptr.2d 132, 976 P.2d 683] (*Hart*).) Defendant's claim also founders on its merits. The record supports the argument that (1) defendant placed a gun to Castro's head, and (2) he fired the gun. The prosecutor carefully argued nothing more than those facts. Finally, any possible misconduct was harmless. (*Stansbury, supra,* 4 Cal.4th at p. 1057.)

c) *Mandich's credibility*

Defendant's third allegation of misconduct concerns the prosecutor's characterization of David Mandich. Defense counsel had argued Mandich displayed "extreme bias" and that his "credibility on that identification issue was ridiculous." The prosecutor answered by arguing, "[Mandich] was about 90 percent certain [of his lineup identification] because he wanted to leave room for the possibility that the defendant had a twin brother standing in this lineup. So that's how careful he was. [¶] There is an honest man. This is one of the best witnesses you can ever have in a murder case. And the defense has to stoop to the level of calling this man, not only a liar, but a criminal himself is one of the most outrageous things I've ever heard in my career. And I don't think you should pay any attention to that." "And, Ladies and Gentlemen, that is the testimony of an honest witness, of a good witness, the kind of witness that I wish I had more of in these kind[s] of cases." Defendant now objects to this argument, but failed to do so at trial, and therefore has waived this claim on appeal. (*Hart, supra,* 20 Cal.4th at p. 619.) Furthermore, there is no merit to the allegation. The prosecutor exhorted the jury to credit Mandich's account based on matters within the record, not matters within her personal knowledge. (*Stansbury, supra,* 4 Cal.4th at p. 1059, distinguishing *People v. Gates* (1987) 43 Cal.3d 1168, 1187 [240 Cal.Rptr. 666, 743 P.2d 301].) Finally, any possible misconduct was harmless. (*Stansbury,* at p. 1057.)

11. *Jury Instructions*

The trial court refused to instruct the jury with many of defendant's proposed special instructions.

a) *Instruction No. 11*

Defendant asked the court to instruct the jury that "[i]f you have any reasonable doubt as to the credibility or truthfulness of any statement made by any witness against the defendant, you must resolve that doubt in favor of the defendant and find such statement to be untrue." The trial court deemed the instruction duplicative of other instructions concerning false statements of witnesses, willfully false witnesses, and the presumption of

innocence. Defendant now contends that whereas CALJIC No. 2.90 instructed the jury on reasonable doubt generally, it did not inform them of the need to find each witness's testimony true by that standard. To the extent defendant's proposed instruction went beyond CALJIC No. 2.90, it was incorrect and properly denied.

Contrary to defendant's requested instruction, the existence of reasonable doubt concerning some aspect of a witness's statement does not require its negation. We have observed "a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others." (*People v. Williams* (1992) 4 Cal.4th 354, 364 [14 Cal.Rptr.2d 441, 841 P.2d 961].) In the instant case, for instance, the possibility that a witness falsely minimized his own involvement does not preclude the possibility that the rest of his description of an event was true. Furthermore, " 'It is . . . established that each fact in a chain of circumstances need not be proved beyond a reasonable doubt.' " (*People v. Van Winkle* (1999) 75 Cal.App.4th 133, 147 [89 Cal.Rptr.2d 28], quoting *People v. Naughton* (1969) 270 Cal.App.2d 1, 8 [75 Cal.Rptr. 451].)

Defendant's authority, *People v. Hidalgo* (1947) 78 Cal.App.2d 926, 936 [179 P.2d 102], does not hold otherwise. The trial court there read the instruction defendant here requested, and rejected a defense request to read a similar instruction. (*Ibid.*) The Court of Appeal found the trial court's rejection of the other instruction was not error as it duplicated the instruction actually read. (*Ibid.*) The Court of Appeal nowhere stated the instruction was a correct statement of law, let alone one defendant was entitled to have read.[13]

The trial court properly refused to read defense instruction No. 11.

b) *Instruction Nos. 13 and 15*

Defendant requested instruction No. 13: "Proof which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence. It merely raises a possibility and is not sufficient for an inference of fact." Defendant also requested instruction No. 15: "You have no right to convict the defendant of a crime upon mere suspicion however strong nor simply because there may be a preponderance of all of the evidence in the case against him nor merely because there is or may be strong reason to suspect that he is guilty. [¶] Before you can lawfully

---

[13]It would be correct to instruct that the People must prove every element of the offense beyond a reasonable doubt, but a defendant is not entitled to that instruction. (*People v. Reed* (1952) 38 Cal.2d 423, 430 [240 P.2d 590]; *People v. Orchard* (1971) 17 Cal.App.3d 568, 577 [95 Cal.Rptr. 66].)

convict, you must be convinced of the defendant's guilt beyond a reasonable doubt." The trial court found both instructions repeated the substance of CALJIC No. 2.90, and refused defendant's request. This was proper. Assuming, arguendo, that the proposed instructions correctly described the law, a defendant has no right to restatement of the reasonable doubt standard expressed in CALJIC No. 2.90. (§ 1096a; *People v. Wright* (1988) 45 Cal.3d 1126, 1134 [248 Cal.Rptr. 600, 755 P.2d 1049].)

### c) *Instruction No. 18*

Defendant requested instruction No. 18: "You should view with extreme caution any purported out-of-court statement made by a witness that has been admitted as substantive evidence because they are not made under oath, and, if false, are not subject to prosecution [for] perjury. [¶] Furthermore, in determining whether or not an out-of-court statement is true, you should consider the circumstances under which it was made including the fact that you did not have a chance to see the witness'[s] demeanor at the time the out-of-court statement was made, and that the statement was not subject to cross-examination at the time it was made." Defendant based the request on *People v. Lopez* (1975) 47 Cal.App.3d 8, 13 [120 Cal.Rptr. 562]. *Lopez* concerned a defendant's admission, but defendant argued *Lopez*'s rationale extends to other witnesses' extrajudicial statements also. In denying this request, the trial court correctly recognized the distinction between the extrajudicial statements of a party and those of a nonparty witness.

A party's extrajudicial statement may be offered against a party under Evidence Code section 1220 due to the declarant's identity. By contrast, the extrajudicial statements of a nonparty witness are not admissible unless they bear some indicia of trustworthiness. In this case, the People offered extrajudicial statements that were admissible under Evidence Code section 1235, which renders admissible the prior inconsistent statements of a witness. As the Law Revision Commission comments note, such prior inconsistent statements are trustworthy. "The declarant is in court and may be examined and cross-examined in regard to his statements and their subject matter. In many cases, the inconsistent statement is more likely to be true than the testimony of the witness at the trial because it was made nearer in time to the matter to which it relates and is less likely to be influenced by the controversy that gave rise to the litigation. The trier of fact has the declarant before it and can observe his demeanor and the nature of his testimony as he denies or tries to explain away the inconsistency. Hence, it is in as good a position to determine the truth or falsity of the prior statement as it is to determine the truth or falsity of the inconsistent testimony given in court." (Cal. Law Revision Com. com., Deering's Ann. Evid. Code (1986 ed.) foll. § 1235, pp.

389-390.) Accordingly, trial courts provide cautionary instructions only for extrajudicial statements made by a party. (*People v. Sims* (1976) 64 Cal.App.3d 544, 556 [134 Cal.Rptr. 566].)

The trial court properly refused to read defense instruction No. 18.

d) *Instruction No. 21*

 Defendant requested instruction No. 21: "The corroboration of the testimony of an accomplice required by law is not sufficient if it merely shows the commission of the offense or some or all of the circumstances thereof, or if it does no more than raise a suspicion of guilt of the defendant." The trial court refused to read the instruction, finding the standard CALJIC instructions adequately conveyed its substance. The trial court instructed the jurors with CALJIC Nos. 3.11 (Testimony of Accomplice Must be Corroborated) and 3.12 (Sufficiency of Evidence to Corroborate an Accomplice), and adequately advised them on how to evaluate accomplice testimony for purposes of corroboration. The trial court properly refused to read defendant's duplicative instruction. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1079-1080 [25 Cal.Rptr.2d 867, 864 P.2d 40] (*Berryman*).)

e) *Instruction No. 23*

 The trial court agreed to read a modified version of defendant's instruction No. 23. The court agreed to instruct the jury: "The requirement of corroboration of the testimony of an accomplice is based on the notion that the testimony of an accomplice should be viewed with suspicion because it may have been given in the hope or expectation of leniency or immunity." It appears, however, the trial court inadvertently failed to read this instruction to the jury. The People now contend defendant's failure to object waived the issue. Without deciding whether defendant adequately preserved the issue for appeal, we find no error in its omission. The trial court properly instructed the jury on CALJIC Nos. 2.20 (Believability of Witnesses) and 3.18 (Testimony of Accomplice to be Viewed with Distrust). These instructions properly informed the jury how to consider accomplice testimony. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 881 [273 Cal.Rptr. 757]; *People v. Castro* (1979) 99 Cal.App.3d 191, 197 [160 Cal.Rptr. 156].) Even where an omitted instruction concerns an "essential element," its absence may be cured by other instructions. (*Musselwhite, supra,* 17 Cal.4th at p. 1248.) No error appears.

f) *The omitted written instructions*

The trial court read CALJIC Nos. 2.02 and 2.03 orally, but inadvertently omitted these instructions from the written set with which the jury was

provided. Defendant assigns error to this failure. The Attorney General contends defendant has waived this issue by failing to object at trial. Without deciding whether defendant preserved the issue, we find it fails on the merits. Although providing written instructions is "generally beneficial and to be encouraged," defendant has no federal or state constitutional right to instructions in writing (*People v. Samayoa* (1997) 15 Cal.4th 795, 845 [64 Cal.Rptr.2d 400, 938 P.2d 2] (*Samayoa*)), and the statutory right depends on an express request. (§ 1093, subd. (f).) Furthermore, defendant has not shown it is reasonably probable that the jury would have reached a result more favorable to defendant had it received a written copy of CALJIC Nos. 2.02 and 2.03. (*People v. Cooley* (1993) 14 Cal.App.4th 1394, 1399 [18 Cal.Rptr.2d 346]; *People v. Blakley* (1992) 6 Cal.App.4th 1019, 1023 [8 Cal.Rptr.2d 219].)

### 12. *Cumulative Error*

Defendant contends the cumulative error that occurred during the guilt phase compels reversal. Consistent with our review of defendant's individual claims, we find no cumulative error occurred. (*Bradford, supra*, 15 Cal.4th at p. 1344.)

### B. *Penalty Phase*

#### 1. *Admission of Defendant's Possession of a Handcuff Key*

Deputy Sheriff David Mertens searched defendant one evening and found a piece of metal concealed in defendant's wristband. The instrument, which the deputy considered a makeshift handcuff key, easily opened handcuffs just like the ones restraining defendant when he traveled to court. Deputy Sheriff Hall searched defendant's property and discovered a shank. Defendant now contends the trial court erroneously admitted this evidence.

Section 190.3, factor (b) permits the trier of fact to consider the defendant's criminal activity that "involved the use or attempted use of force or violence or the express or implied threat to use force or violence." In *People v. Mason* (1991) 52 Cal.3d 909 [277 Cal.Rptr. 166, 802 P.2d 950] and *People v. Gallego* (1990) 52 Cal.3d 115 [276 Cal.Rptr. 679, 802 P.2d 169], we upheld the admission under section 190.3, factor (b) of evidence showing the defendant possessed weapons in jail and attempted to escape. (*Mason*, at pp. 954-957; *Gallego*, at pp. 155, 196.) In *People v. Howard* (1988) 44 Cal.3d 375, 428 [243 Cal.Rptr. 842, 749 P.2d 279], we found that even possession of a handcuff key by itself could evince an express or implied threat to use force or violence. We did not conclusively decide the question

in *Howard*, however, because we found the abundant additional evidence presented of violent activity rendered any error in admitting the handcuff key evidence harmless. (*Ibid.*) The People in the instant case also presented abundant additional evidence of violent activity. We find *Mason*, *Gallego* and *Howard* persuasive, and find the trial court did not commit prejudicial error in admitting the evidence in question.

Defendant cites *People v. Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782], where we found the defendant's removing a metal grating from an air vent was not admissible under section 190.3. In that case, "the Attorney General argue[d] that the presumably violent removal of the grate [was] sufficient to justify admission of the evidence." (*Boyd*, at p. 776.) We rejected the contention that the violent injury *to the property* satisfied section 190.3. We had no occasion to consider the proposition, described in *Howard*, that "the possession of the handcuff key and its implied intended use to permit defendant to free himself from handcuffs, normally worn during defendant's transportation in the custody and presence of law enforcement personnel, constituted criminal activity which posed an 'implied threat' to use force or violence." (*People v. Howard, supra*, 44 Cal.3d at p. 428.) The *Boyd* decision therefore does not lead us to find the trial court prejudicially erred in admitting the key evidence.

Defendant also asserts the admission of the key violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 1, 7, 15, 16 and 17 of the California Constitution. He acknowledges, however, that the same analysis governs both the constitutional claim and the allegation of error under Penal Code section 190.3, factor (b), because the statutory claims underlying defendant's motion "to exclude evidence about the purported handcuff key are the same arguments that support the constitutional issues. The trial court's resolution of one effectively resolved the other." In light of our finding that there was no error under Penal Code section 190.3, we find no constitutional violation.

### 2. *Prosecutorial Argument*

Defendant alleges violation of these same federal and state constitutional provisions by four instances of prosecutorial misconduct during closing argument. We reject all four allegations.

#### a) *Remorse*

The prosecutor argued defendant expressed no remorse for his behavior, and was proud of the killings. "The interesting thing about this

defendant's behavior that night [of the Castro murder] is that he felt absolutely no remorse for what he had done. He ran back to the car. He told his friends 'Hey, I just shot the guy.' [¶] There is some evidence according to the statement of Oscar [Montes] he was bragging about the fact that after he shot the guy, or as he was shooting the man, Joe Castro, that Joe Castro said, Quote 'Oh, shit.' This was something the defendant was bragging about to his friends. [¶] He was bragging to his friends about the fact that he shot the guy. That he shot Joe Castro. [¶] It shows the type of person that the defendant is and shows the type of murder that this was, and that's why under factor (a) these are things that you should, and I ask you to consider now, in determining the defendant's moral responsibility and the punishment that he deserves."

This argument was proper. Section 190.3, factor (a), to which the prosecutor expressly referred, authorizes the jury to consider the circumstances of the crime. The jury may consider the defendant's refusal to show any remorse in the context of the murder as an aggravating factor. (*Ramos, supra*, 15 Cal.4th at p. 1164; *People v. Sully* (1991) 53 Cal.3d 1195, 1249 [283 Cal.Rptr. 144, 812 P.2d 163].)

The prosecutor further emphasized defendant's failure to show remorse in the two years following the murders. "[Section 190.3], [f]actor (k) evidence would have permitted that evidence [of remorse] to be presented to you if it existed. If the defendant wrote a letter to his mother saying 'I'm sorry, so sorry for the pain I've caused you and the pain I've caused the victims' families.' If he called his sister and said that, you would have heard that. [¶] I think we have more than enough evidence that not only is the defendant a cold-blooded murderer, but he is really proud, proud of what he has done."

This argument was also proper. Although defendant characterizes this argument as an invitation to the jury to consider this fact aggravating, the prosecutor expressly referred to section 190.3, factor (k), which is available only to mitigate the murders. (*People v. Frye* (1998) 18 Cal.4th 894, 1021 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*).) The prosecutor properly argued defendant's lack of remorse showed the potential mitigating factor was inapplicable. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1270-1271 [278 Cal.Rptr. 640, 805 P.2d 899].)

b) *The placement of the gun*

The prosecutor argued, "It was the defendant himself who walked up to the driver's side of that car, pointed the gun at the head of Mr. Castro and demanded he relinquish his car. . . . I remember arguing at the guilt phase

with regard to David Mandich's testimony that when the defendant was standing at the car, according to the accomplices, we had the defendant pointing the gun at the head of Joe Castro and threatening to kill him if he didn't get out of the car." As with her guilt phase argument, the prosecutor's argument correctly followed the record.

### c) *Inadequacy of imprisonment*

The prosecutor argued prison was insufficient punishment for defendant. "The defendant, by [your] sending him to prison, isn't going to sit in prison for the rest of [his] life and think about how bad he feels and how sorry he is for what he's done. It will just be life for him, life as usual. . . . [¶] . . . [F]or this defendant, I don't think that prison is such a terrible thing. [¶] The reason I say that is that prison is really an intolerable place for people that abide by the law. But for people that don't, for people that live by no laws at all, prison can be a very tolerable place." Defendant contends the evidence did not support this argument. We have approved similar comments that life imprisonment is an insufficient penalty given an individualized assessment of the defendant. (*People v. Smithey* (1999) 20 Cal.4th 936, 997-999 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Lucas* (1995) 12 Cal.4th 415, 496 [48 Cal.Rptr.2d 525, 907 P.2d 373] [defendant's "brutality was such that he 'would not even see the bars' "].) This argument was proper.

### d) *Comparison to other special circumstance cases*

██ Defendant argued his crimes were not the "worst of the worst." During argument, defense counsel asked "what kinds of heinous crimes are we talking about that justify the death penalty?" He then described in vivid detail the murders committed by infamous serial murderers, including Richard Ramirez, "the Night Stalker"; Lawrence Bittaker, who tortured, raped and murdered five teenage girls, and recorded their death screams; David Carpenter, "the Trailside Strangler," who raped and killed "eight or ten" women; and William Bonin, "the Freeway Killer," who murdered 14 teenagers. Although the defense counsel conceded, "[Y]ou don't have to be a mass murderer to get the death penalty," he argued, "I am trying to show you also that it takes more. [¶] It takes the worst of the worst or it should for a death penalty. . . . [Defendant] is not the worst of the worst. He is not in the category of people that should get the death penalty."

The prosecutor attempted to answer the question defense counsel posed. "What kind of cases do we have a death penalty for . . . . [¶] The death penalty isn't sought in every case where special circumstances are alleged." The defense objected, citing *Brooks v. Kemp* (11th Cir. 1985) 762 F.2d 1383

(*Brooks*). The court overruled the objection, finding the People's argument responded fairly to the defense argument. "I would never allow the prosecutor to stand up in the opening argument and give a laundry list of people in the State of California who committed one felony murder and were given the death penalty. I would never allow that. [¶] But when you make the argument only the worst of the worst get the death penalty, and you give a laundry list of all the cases, giving the jury the impression that only those people are appropriate for death, it's proper for the prosecutor to point out there are cases involving special circumstances that are not appropriate for death."

The trial court properly overruled the objection. The prosecutor continued, explaining the numerous special circumstances that could support a death sentence. "Not all of those cases, not in every case where there is an allegation of special circumstances . . . do we even seek the death penalty. . . . [¶] [Defense counsel] said you will see the death penalty . . . in only the worst of the worst. I submit to you that's not correct. [¶] I'm not going to give you names or specifics of cases, but there are cases where the death penalty is imposed . . . where there is one count of murder committed. . . . And these people do receive the death penalty." Finally, the prosecutor directed the jury's attention to defendant's individual circumstances. "It's not an appropriate function to speculate as to what other cases involve in terms of the evidence and the factors . . . . [Y]our sole function in this case [is] to determine what those circumstances or factors are, the good and the bad, and weigh and balance them."

The Eleventh Circuit Court of Appeals found nonprejudicial error in the prosecutor's argument that the prosecution sought death in very few cases, which could " 'lead the jury to believe that the whole governmental establishment had already determined the appellant to be guilty . . . .' " (*Brooks, supra,* 762 F.2d at p. 1410, quoting *Hall v. United States* (5th Cir. 1969) 419 F.2d 582, 587.) The Eleventh Circuit expressed concern that "[t]he argument improperly suggested that the prosecutor had canvassed all murder cases and selected this one as particularly deserving of the death penalty, thus infringing upon the jury's decisionmaking discretion and improperly invoking the prosecutorial mantle of authority." (*Brooks,* at p. 1413, fn. omitted.)

The prosecutor's argument neither implied any "governmental establishment" had determined the propriety of a death sentence in this case nor infringed upon the jury's discretion. Furthermore, the prosecution offered a fair response to the defense argument that capital punishment was properly limited to serial killers. If the defense argued that only the "worst of the worst" received a death sentence, the prosecutor was entitled to argue

defendant was not among the "best of the worst," and a death sentence was therefore appropriate. This argument was proper.

### 3. *Jury Instructions*

Defendant contends the trial court improperly instructed the jury and improperly denied defendant's proposed instructions. We reject each allegation of instructional error.

#### a) *CALJIC No. 8.88*

The trial court instructed the jury with CALJIC No. 8.88, both orally and with a written copy.[14] Defendant now alleges the instruction is defective in that (1) it failed to guide the jury's sentencing discretion; (2) the "so substantial" standard created a presumption for death; and (3) it failed to define "aggravating" and "mitigating" for the jury. We have repeatedly rejected the instant challenges to CALJIC No. 8.88, and do so again. (*Arias, supra,* 13 Cal.4th at pp. 170-171; *Rodrigues, supra,* 8 Cal.4th at pp. 1191-1192; *Johnson, supra,* 6 Cal.4th at p. 52.)

#### b) ₀ *Defense special instruction No. 3*

 Defendant asked the court to read special instruction No. 3: "You may not consider as aggravation any evidence of unadjudicated acts allegedly committed by the Defendant unless you first determine beyond a

---

[14]"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. [¶] After having heard all the evidence and having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] An aggravating factor is any fact, condition, or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself. A mitigating circumstance is any fact, condition or event which as such does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole. [¶] You shall now retire and select one of your number to act as foreperson, who will preside over your deliberations. In order to make a determination as to the penalty, all twelve jurors must agree. [¶] Any verdict that you reach must be dated and signed by your foreperson on a form that will be provided and then you shall return with it to this courtroom."

reasonable doubt that (1) the Defendant committed the acts; [and] (2) the acts involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence." The trial court refused to read the instruction, finding it was duplicative of CALJIC No. 8.87, which informed the jury it could not consider the acts unless the jury found beyond a reasonable doubt that the acts occurred, but which did not invite the jury to determine for itself whether the acts involved the use, attempted use, or threat, of force or violence.

As the People note, we have upheld CALJIC No. 8.87 in the past. (*People v. Millwee* (1998) 18 Cal.4th 96, 162, fn. 33 [74 Cal.Rptr.2d 418, 954 P.2d 990].) Defendant asserts, however, that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435] (*Apprendi*) requires the jury to find beyond a reasonable doubt that the evidence established the attempted, threatened, or actual use of force or violence. We reject this contention, and conclude *Apprendi* does not extend to require a jury to find beyond a reasonable doubt the applicability of a specific section 190.3 sentencing factor.

In *Apprendi,* the United States Supreme Court decided which sentencing bases must be determined (1) beyond a reasonable doubt (2) by a jury. *Apprendi* itself excluded from its scope "state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." (*Apprendi, supra,* 530 U.S. at p. 496 [120 S.Ct. at p. 2366].) The *Apprendi* court cited as an example the sentencing scheme described in *Walton v. Arizona* (1990) 497 U.S. 639 [110 S.Ct. 3047, 111 L.Ed.2d 511], whose holding compels rejection of defendant's instant claim. Arizona law provided that convicted first degree murderers were subject to a hearing in which the trial court decided whether to sentence the defendant to death or life imprisonment. A finding of first degree murder in Arizona was thus the functional equivalent of a finding of first degree murder with a section 190.2 special circumstance in California; both events narrowed the possible range of sentences to death or life imprisonment.[15]

*Walton* held there was no constitutional right to a jury determination that death was the appropriate penalty. (*Walton v. Arizona, supra,* 497 U.S. at pp. 647-649 [110 S.Ct. at pp. 3053-3054].) As the *Apprendi* court explained, a death sentence is not a statutorily permissible sentence until the jury has found the requisite facts true beyond a reasonable doubt. In Arizona, the

---

[15]An Arizona defendant sentenced to life imprisonment for first degree murder would be eligible for parole after 25 years of imprisonment. (*Poland v. Arizona* (1986) 476 U.S. 147, 153, fn. 4 [106 S.Ct. 1749, 1754, 90 L.Ed.2d 123].)

requisite fact is the defendant's commission of first degree murder; in California, it is the defendant's commission of first degree murder with a special circumstance. Once the jury has so found, however, there is no further *Apprendi* bar to a death sentence. " 'Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed . . . .' " (*Apprendi, supra*, 530 U.S. at p. 497 [120 S.Ct. at p. 2366], quoting *Almendarez-Torres v. United States* (1998) 523 U.S. 224, 257, fn. 2 [118 S.Ct. 1219, 1237, 140 L.Ed.2d 350] (dis. opn. of Scalia, J.).)

As we observed in *People v. Anderson* (2001) 25 Cal.4th 543 [106 Cal.Rptr.2d 575, 22 P.3d 347], once a jury has determined the existence of a special circumstance, the defendant stands convicted of an offense whose maximum penalty is death. (*Id.* at p. 589, fn. 14.) Therefore, a penalty determination of death does not result in a sentence that exceeds the statutory maximum prescribed for the offense of first degree murder with a special circumstance. The Eighth Circuit Court of Appeals has upheld the Federal Death Penalty Act's sentencing provisions through this reasoning: "[T]he statutes at issue expressly authorize a maximum penalty of death and the sentencing factors of mental culpability and aggravating circumstances do not increase the sentencing range but rather provide the particularized standards for choosing which of the alternative available sentences should be imposed." (*U.S. v. Allen* (8th Cir. 2001) 247 F.3d 741, 763.) Accordingly, *Apprendi* does not restrict the sentencing of California defendants who have already been convicted of special circumstance murder.

c) *Defense special instruction No. 4*

Defendant asked the court to read special instruction No. 4: "The determination of punishment turns on the personal moral culpability of the Defendant. [¶] Such culpability is assessed in accordance with the specified factors of aggravation and mitigation upon which you also have received instruction. [¶] The circumstances of the crimes can be either aggravating or mitigating. Their character depends on the greater or lesser blameworthiness they reveal, ranging, for example, from the most intentional of willful, deliberate, and premeditated murder to the most accidental of felony murders." The trial court properly refused to read this instruction because it was duplicative of other instructions, it was an inaccurate statement of law, and it did not apply to the case.

The trial court properly refused defendant's request. CALJIC Nos. 8.85 and 8.88 adequately informed the jury about what to consider in determining

the penalty. The requested instruction was therefore duplicative. (*Berryman, supra*, 6 Cal.4th at pp. 1103-1104.) Furthermore, as the court observed, there was no evidence that the Castro murder was "accidental." Finally, insofar as the proposed instruction told the jury that premeditated murders supported a death sentence more than felony murders, it did not correctly describe California law. Both kinds of murder qualify as murder in the first degree. (§ 189.) Like other jurisdictions, California deems both to be among the most serious kinds of murder. (See *Schad v. Arizona* (1991) 501 U.S. 624, 640-641 [111 S.Ct. 2491, 2501-2502, 115 L.Ed.2d 555].) California has further categorized murder in the commission of an enumerated felony as a special circumstance, which supports a sentence of death or life imprisonment without possibility of parole. (§ 190.2, subd. (a)(17).) The proposed instruction would have incorrectly informed jurors that felony murders are less serious for the purpose of punishment than premeditated and deliberate murders. The trial court properly refused to read special instruction No. 4.

d) *Defense special instruction No. 5*

Defendant asked the court to read special instruction No. 5: "Evidence has been introduced for the purpose of showing the specific harm caused by the Defendant's crimes. Such evidence was not received and may not be considered by you to divert your attention from your proper role of deciding whether the Defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons for the Jury to show mercy to the Defendant." The trial court refused to read the proposed instruction, finding it was duplicative of CALJIC No. 8.84.1. The proposed instruction would not have provided the jury with any information it had not otherwise learned from CALJIC No. 8.84.1, and the trial court properly refused to read special instruction No. 5. (*Berryman, supra*, 6 Cal.4th at pp. 1103-1104.)

e) *Defense special instruction No. 6*

The trial court granted defendant's request to read the following instruction: "In deciding whether death or life in prison without the possibility of parole is the appropriate sentence, you may not consider for any reason whatsoever the deterrent or non-deterrent effect of the death penalty or the monetary cost to the State of execution or maintaining a prisoner for life without the possibility of parole." When the court read the instruction, it read the following version, "In deciding whether life in prison without the possibility of parole or death is the appropriate sentence, you may not

consider for any reason whatsoever whether or not there is a deterrent effect to the death penalty. [¶] Likewise, you may not consider for any reason whatsoever how much it may cost to keep the defendant in prison for life without the possibility of parole." The most important difference between the instruction prepared and the instruction read was the latter did not warn the jurors not to consider the cost of execution.

The Attorney General asserts defendant has waived any challenge to the instruction by failing to object below. He further contends the error was beneficial to defendant, because the jury was permitted to consider cost as a reason to vote against, but not for, death. He argues defendant cannot complain the instruction implicitly told the jury do otherwise (consider the cost of life imprisonment), because defendant must have believed in the efficacy of the instruction, or else he would never have requested it.

We have held a trial court may refuse to read this instruction where neither deterrence nor cost is raised by the parties. (*People v. Benson* (1990) 52 Cal.3d 754, 806-807 [276 Cal.Rptr. 827, 802 P.2d 330].) Moreover, so long as these issues are not raised, there can be no prejudice from the instruction's omission. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 146 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People v. Thompson* (1988) 45 Cal.3d 86, 132 [246 Cal.Rptr. 245, 753 P.2d 37].) The absence of evidence regarding these issues during the penalty phase precludes our finding prejudicial error.

f) *Defense special instruction No. 7*

Defendant asked the trial court to read special instruction No. 7: "You may consider the fact that the Defendant's accomplices received more lenient sentences as a mitigating factor." The trial court ruled the instruction was contrary to California law as expressed in *People v. Beardslee* (1991) 53 Cal.3d 68, 111-112 [279 Cal.Rptr. 276, 806 P.2d 1311]. Since *Beardslee*, we have adhered to our position that the jury need not be instructed to consider the sentences received by codefendants.[16] (*Rodrigues, supra,* 8 Cal.4th at pp. 1188-1189; *People v. Mincey* (1992) 2 Cal.4th 408, 479-480 [6 Cal.Rptr.2d 822, 827 P.2d 388].) We maintain that position here.

g) *Defense special instruction No. 15*

Defendant asked the trial court to read special instruction No. 15: "After weighing all the aggravating and mitigating factors, it is up to you individually to decide which of the punishments, life imprisonment without parole or

---

[16]Of course, there were no codefendants in the instant trial. With the exception of Juan Velasquez, who fled the country, defendant's cohorts all pleaded guilty prior to defendant's trial.

death, should be imposed in this case. [¶] You must always keep in mind that each of you bears the ultimate moral responsibility to determine the appropriate penalty under all the circumstances of this case." The trial court refused to read the instruction, ruling it was covered by CALJIC No. 8.88. The trial court properly refused the proposed instruction, which was duplicative of CALJIC No. 8.88. (*Berryman, supra,* 6 Cal.4th at pp. 1103-1104.)

h) *Defense special instruction No. 24*

Defendant asked the trial court to read special instruction No. 24: "You must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crime for which the defendant has been convicted. [¶] In other words, do not consider the same facts more than once in determining the presence of aggravating factors." The trial court refused to read the instruction in light of the standard instruction on aggravating factors.

The instruction is of uncertain validity. We have observed a prior felony conviction for a violent crime could fulfill both section 190.3 factors (b) (violent criminal activity) and (c) (prior felony conviction). (*People v. Melton* (1988) 44 Cal.3d 713, 764-765 [244 Cal.Rptr. 867, 750 P.2d 741].) The jury may consider a prior conviction for a violent felony under both factors. (*Ibid.;* see also *People v. Price* (1991) 1 Cal.4th 324, 472 [3 Cal.Rptr.2d 106, 821 P.2d 610].) In any event, the prosecutor did not urge the jury to "double count" and the possibility of prejudice is therefore " 'remote.' " (*Medina, supra,* 11 Cal.4th at p. 779.) We find no error.

i) *Defense special instruction No. 28*

Defendant asked the trial court to read special instruction No. 28: "Evidence has been presented of defendant's lifestyle or background. You cannot consider this evidence as an aggravating factor, but may consider it only as a mitigating factor." The trial court refused to read the instruction because it was confusing and a misstatement of law.

The Attorney General points out that insofar as defendant's lifestyle included gang-related criminal activity, it could be a proper factor in aggravation. Defendant's argument appears to use the term "background" in the context of his ethnic background, which is not a legitimate factor in aggravation or mitigation. In any event, there was no error, as the trial court properly instructed the jury on aggravating and mitigating factors.

The trial court properly instructed the jury during the penalty phase.

### 4. *Intercase Proportionality Review*

■ Defendant contends California unconstitutionally imposes the death penalty without intercase proportionality review. There is no constitutional requirement of intercase proportionality review. (*Pulley v. Harris* (1984) 465 U.S. 37, 50-51 879-880, 98[104 S.Ct. 871, 79 L.Ed.2d 29]; *People v. Marshall* (1996) 13 Cal.4th 799, 865-866 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

### 5. *Intracase Proportionality Review*

Defendant also contends his death sentence was arbitrary and disproportionate to the penalties imposed on his codefendants. This claim likewise fails. For one thing, there were no codefendants. We need not compare a death sentence with the plea bargain terms received by defendant's companions. "The exercise of prosecutorial discretion in obtaining evidence and making charging decisions is not pertinent to a review of a capital sentence." (*People v. Morris* (1991) 53 Cal.3d 152, 235, fn. 25 [279 Cal.Rptr. 720, 807 P.2d 949].) Furthermore, defendant's sentence was not disproportionate to those received by his accomplices. With respect to the Castro murder, defendant was the actual killer, as well as the instigator of the carjacking. No one else sought to use lethal force to take the Trans Am. With respect to the Navarette murder, defendant was also primarily responsible for the offense. The gang did not set out to avenge past shootings of 18th Street Gang members until defendant arrived with his truck and facilitated the murder. As one witness explained, the shooting would not have occurred without defendant because he was the one whose vehicle enabled the gang to commit the murder. His greater involvement justifies his more severe sentence. (*People v. Douglas* (1990) 50 Cal.3d 468, 540 [268 Cal.Rptr. 126, 788 P.2d 640].) Even if the involvement of any of defendant's cohorts equaled that of defendant, his death sentence is not constitutionally suspect. (*Sanders, supra,* 51 Cal.3d at p. 530.)

### 6. *Cumulative Error*

Defendant contends the cumulative error that occurred during the penalty phase compels reversal. Consistent with our review of defendant's individual claims, we find no cumulative error occurred. (*Bradford, supra,* 15 Cal.4th at p. 1344.)

### 7. *Constitutionality of the Special Circumstances*

■ Defendant contends neither special circumstance found below, the commission of multiple murders (§ 190.2, subd. (a)(3)) or the commission of

murder in the commission of an attempted robbery (§ 190.2, subd. (a)(17)(A)), adequately narrows the class of first degree murders, and his death sentence is therefore unconstitutional. We reject this claim and continue to hold that section 190.2 and its enumerated special circumstances adequately perform the narrowing function compelled by the Eighth Amendment. (*Kraft*, *supra*, 23 Cal.4th at p. 1078.)

### 8. *Section 190.4, Subdivision (e) Motion*

■ Defendant contends the trial court erred in denying the section 190.4 subdivision (e) motion to modify the verdict. Defendant contends (1) the court failed to reweigh independently the penalty phase evidence; (2) insufficient evidence supports the denial of the motion; and (3) the trial court erroneously considered impermissible factors in denying the motion to modify the verdict. These claims fail.

### a) *The trial court's reweighing the evidence*

Defendant moved to modify the verdict in accordance with section 190.4, subdivision (e). After hearing argument, the trial court addressed the merits of the motion in great detail.

The court began by noting its statutory obligation "to review the entire record and determine whether the jury's judgment of death is consistent with both the facts and the law." After reviewing the evidence and the section 190.3 factors, the court observed, "My duty then is to apply the same rules that the jury applied in determining whether the judgments of death were appropriate. [¶] In this case I believe that the circumstances in aggravation are so strong, so overwhelming in contrast with the really minimal evidence of mitigation that the jury verdict was appropriate. [¶] It was consistent with the facts. It was consistent with the law. [¶] And I do specifically find that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that as to counts 1 and 3 the jury verdict was appropriate, and this court respectfully declines the opportunity to modify the jury's verdicts."

In reviewing defendant's automatic section 190.4, subdivision (e) motion, "the trial judge's function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict*." (*People v. Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627].) The above statements prove the trial court fulfilled its duty.

b) *Evidence supporting the death verdict*

■ In reviewing the trial court's decision, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty. (*People v. Mickey* (1991) 54 Cal.3d 612, 704 [286 Cal.Rptr. 801, 818 P.2d 84].) ■ We find the trial court properly denied the motion to modify the death verdict.

The trial court found the circumstances of both murders were aggravated. The court characterized the Castro murder as "cold-blooded," "absolutely [without] justification," and the result of a "planned affair." The court deemed defendant the "moving force" behind the Navarette murder, "the one who caused this entire incident to take place." The court also noted Navarette was an innocent person, not a gang member or anyone who had invited any form of retaliation. The court also found Navarette's brother, Rudolfo Rivera, was endangered by the attack, and had to watch the murder of his brother.

The court also discussed the other evidence presented by the People during the penalty phase. The court found "particularly horrendous" the robbery of Freddie Garcia. Only several hours after murdering Castro, defendant led an attack on Garcia, in which defendant punched, kicked and threatened to shoot his victim. The court further recalled the robbery of Lionel Fricks, defendant's possession of a shank and a makeshift handcuff key, and defendant's involvement in racial violence while incarcerated, although the court found little significance in that latter fact.

The court then reviewed the evidence offered in mitigation. The court recalled defendant had been mistreated by children in his neighborhood, and that his sister had been assaulted and hospitalized. The court noted defendant communicated with his sister's children and his own daughter. The court recalled the testimony of Dr. Maloney, who testified defendant had a "low-end IQ," but was neither retarded nor psychotic. The court described the testimony of defendant's father, Eduardo Ochoa. The court further noted defendant had only five incident reports while in jail, and two of those were trivial in nature. The court observed defendant did not personally kill Navarette, and it cited the defense's position that defendant did not intend Castro's death. The court concluded its analysis by mentioning each of the statutory mitigating factors listed in section 190.3. The court stated defendant was relatively young (§ 190.3, factor (i)), and was an accomplice (§ 190.3, factor (j)), but that section 190.3, factors (d) through (h) did not apply to mitigate his crimes.

The court comprehensively recalled the evidence, and the evidence well supported the decision to deny the motion. (*Hart, supra,* 20 Cal.4th at p. 657.)

c) *Reliance on improper evidence*

Defendant contends the trial court based its decision on matters not supported by the record. He assigns error to the court's finding that defendant was the leader of the attack on Freddie Garcia. The record reflects that of the four males who approached Garcia, defendant did all the talking and threatened to kill Garcia if he did not give up his car. When Garcia was able to stand up after being kicked repeatedly, defendant punched him again. Although Garcia saw another individual holding a gun, it was defendant who stated, "Give up your car, otherwise I'm going to shoot you." Defendant entered the car and drove it away, with the other males as passengers. The evidence supports the trial court's finding.

Defendant also objects to the trial court's characterization of defendant as the "moving force" behind the Navarette murder. The record shows the other 18th Street Gang members were simply loitering on the street until defendant arrived with his truck and told the others that he had just seen Crazy Riders driving eastbound on Pico Boulevard. At that point, Aguilar grabbed a weapon. While driving, defendant accelerated, changed lanes and maneuvered the truck to render possible Navarette's shooting. As David Alonzo testified, the shooting would not have occurred but for defendant's involvement. The evidence supports the trial court's finding.

Finally, defendant objects to the court's noting he also shot in the vicinity of Navarette's brother and passenger, Rudolfo Rivera, as there was no evidence showing defendant saw Rivera. The trial court properly considered this evidence, as "we have recognized that the number of victims exposed to the use of a firearm is relevant to the defendant's culpability." (*In re Tameka C.* (2000) 22 Cal.4th 190, 199-200 [91 Cal.Rptr.2d 730, 990 P.2d 603].)

Furthermore, Rivera's presence rendered the shooting more culpable even if defendant did not see Rivera. In *People v. Hansen* (1994) 9 Cal.4th 300, 309-310 [36 Cal.Rptr.2d 609, 885 P.2d 1022], we held that shooting at an inhabited dwelling is an inherently dangerous felony. We found "there always will exist a significant likelihood that an occupant may be present." (*Id.* at p. 310.) Following *Hansen*, the Court of Appeal held that shooting into an occupied vehicle is also an inherently dangerous felony. (*People v. Tabios* (1998) 67 Cal.App.4th 1, 9-11 [78 Cal.Rptr.2d 753].) Just as there is always a significant likelihood there will be someone present inside an inhabited dwelling, there is always the likelihood there will be a second person present in an occupied vehicle. (By definition, there will always be one person.) There was no evidence that defendant, who drove on the left side of Navarette's car, was in a position to dispel that possibility, or tried to

do so. Furthermore, shooting into an occupied vehicle creates an even greater social danger than shooting at an inhabited dwelling. A driver who is shot may lose control of his vehicle, endangering many other drivers and pedestrians nearby.[17] Accordingly, the trial court properly considered this evidence.

### 9. Section 190.3, Factor (a)

Defendant contends factor (a) of section 190.3, which allows the jury to weigh "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," is unconstitutionally vague. The United States Supreme Court has joined us in rejecting this claim. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975-977 [114 S.Ct. 2630, 2636-2637, 129 L.Ed.2d 750]; *People v. Ray* (1996) 13 Cal.4th 313, 358-359 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *Arias, supra*, 13 Cal.4th at p. 187.)

### 10. Miscellaneous Challenges to the Death Penalty

Defendant raises numerous challenges to the death penalty, all of which we have already rejected. We have upheld the death penalty law against the challenge that it (1) fails to narrow the class of death-eligible offenders (*Frye, supra*, 18 Cal.4th at p. 1029); (2) fails to require written findings of aggravating factors (*ibid.*); (3) fails to impose a reasonable doubt standard on the penalty determination (*ibid.*); (4) fails to require juror unanimity (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1255-1256 [69 Cal.Rptr.2d 784, 947 P.2d 1321]); (5) requires mental or emotional disturbance to be "extreme" to qualify under section 190.3, factor (d) (see *People v. Davenport* (1995) 11 Cal.4th 1171, 1230 [47 Cal.Rptr.2d 800, 906 P.2d 1068]); (6) invests the prosecution with unbounded discretion (*Kraft, supra*, 23 Cal.4th at p. 1078); (7) violates international norms (*People v. Ghent* (1987) 43 Cal.3d 739, 778-779 [239 Cal.Rptr. 82, 739 P.2d 1250]); (8) provides insufficient opportunity for postconviction relief (*Fairbank*, at p. 1255); and (9) applies in an unconstitutionally arbitrary manner (*People v. Crittenden* (1994) 9 Cal.4th 83, 156-158 [36 Cal.Rptr.2d 474, 885 P.2d 887]). These miscellaneous claims all fail.

### 11. Delayed Execution

Defendant contends there has been an unconstitutional delay since his trial and sentencing. We have already rejected the contention that the

---

[17]In the instant case, Navarette lost control of his car, which proceeded onto the sidewalk before crashing into a wall.

delay between sentencing and execution violates the Eighth Amendment's proscription of cruel and unusual punishment. (*Frye, supra*, 18 Cal.4th at pp. 1030-1031.) Nevertheless, defendant recharacterizes this claim to assert execution after such delay is unconstitutional because it cannot serve any legitimate penological ends, citing Justice Stevens's dissent to the denial of certiorari in *Lackey v. Texas* (1995) 514 U.S. 1045 [115 S.Ct. 1421, 131 L.Ed.2d 304]. Defendant further observes Justice Breyer seemingly has endorsed this view in his dissent to the denial of certiorari in *Elledge v. Florida* (1998) 525 U.S. 944 [119 S.Ct. 366, 142 L.Ed.2d 303]. We therefore evaluate this newly presented claim, and conclude the delay does not eliminate the legitimate penological purposes supporting the execution.

Both deterrence and retribution are legitimate purposes of punishment. (*Gregg v. Georgia* (1976) 428 U.S. 153, 183 [96 S.Ct. 2909, 2323-2930, 49 L.Ed.2d 859]; *People v. Roberts* (1992) 2 Cal.4th 271, 316 [6 Cal.Rptr.2d 276, 826 P.2d 274].) The delay of which defendant now complains does not prevent the fulfillment of either goal. Insofar as defendant complains of the extreme discomfort he suffers as a result of his uncertainty regarding execution, that discomfort would *enhance* the deterrent effect of the death penalty by increasing the penalty imposed for the commission of capital crimes. By contrast, an announcement by this court that any defendant whose automatic appeal has been pending for many years is exempt from subsequent execution would eviscerate any possible deterrent effect of a death sentence, for it would probably never be imposed.[18]

Similarly, executing defendant, notwithstanding the period that has elapsed since his conviction and sentencing, would further the retributive purpose of capital punishment. Insofar as the "just deserts" theory holds certain murderers do not deserve a fate better than that inflicted on their victims, the passage of time and alteration of circumstances have no bearing on this retributive imperative. (Cotton, *Back With a Vengeance: The Resilience of Retribution as an Articulated Purpose of Criminal Punishment* (2000) 37 Am. Crim. L.Rev. 1313, 1316, citing Kant, Political Writings, The Metaphysics of Morals (Hans Reiss ed. 1991) pp. 131, 156.) For these reasons, Nazi war criminals and church bombers motivated by racial hatred have been prosecuted for murders committed decades earlier. Furthermore, defendant, by delaying his execution for these past nine years, has already reduced the full retributive function of execution, and indefinitely rendered his status more like that of a life prisoner, his objective at trial. To

---

[18]As Justice Clarence Thomas has observed, the only conduct such a holding would deter is prompt filing by petitioners and careful consideration by courts. (See *Knight v. Florida* (1999) 528 U.S. 990, 992 [120 S.Ct. 459, 460-461, 145 L.Ed.2d 370] (conc. mem. opn. of Thomas, J., from denial of petn. for writ of cert.).)

bar his execution would further frustrate the retributive function of capital punishment.

Although we are cognizant of the significant stress faced by prisoners on death row, we cannot conclude their fate is worse than death, which we have long recognized as a constitutional punishment. As the Fifth Circuit of the United States Court of Appeals observed, "[defendant] made no effort to inform the Texas courts that their delay was detrimental to him or to ask for expedited review of his petition and we cannot fault them for assuming that [defendant] would be grateful for or, at least, indifferent to the delay." (*White v. Johnson* (5th Cir. 1996) 79 F.3d 432, 439.) We therefore conclude that execution notwithstanding the delay associated with defendant's appeals furthers both the deterrent and retributive functions; shielding defendant from execution solely on this basis would frustrate these two penological purposes.

12. *Lethal Injection*

Defendant contends lethal injection is an unconstitutional means of execution. We have rejected this claim before and do so again. (*Samayoa, supra,* 15 Cal.4th at p. 864; *Holt, supra,* 15 Cal.4th at p. 702.)

CONCLUSION

For the reasons stated herein, we conclude the judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.**—I concur in the majority opinion except for its treatment of defendant's contention that the delay between sentencing and execution violates the Eighth Amendment's prohibition against cruel and unusual punishment. This court has in the past rejected such a claim, holding that "[a]s long as it is reasonable, the time required for our statutorily mandated review is not a violation of a criminal defendant's constitutional rights; it is essential to ensuring that those rights are and have been respected." (*People v. Ochoa* (1998) 19 Cal.4th 353, 477 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Because the delay here is reasonable, this court's holding in *Ochoa* is dispositive here. I would go no further.

Appellant's petition for a rehearing was denied September 19, 2001.