Filed 12/17/14  P. v. Paredes CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B247650 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA110754) |
| v. | |
| JAMES DELTON PAREDES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick T. Meyers, Judge.  Affirmed.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

_____

James Delton Paredes was convicted of the first degree murder of Juan Carlos Sanchez with true findings he had personally used a firearm during the offense and had committed the murder for the benefit of a criminal street gang. On appeal Paredes does not challenge the sufficiency of the evidence to support the jury's guilty verdict and true findings, but contends the trial court impermissibly admitted evidence of the existence and meaning of an "enemy killer" tattoo on the side of his head; improperly restricted his testimony about the effect on his mother of his brother's gang-related killing several years earlier; and unfairly instructed the jury that statements by a third party to the defense gang expert were to be considered only to evaluate the witness's opinion, not as proof the information contained in the statements was true. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Gang-related Murder Outside a Huntington Park Birthday Party*

Sanchez, known as "Scrappy," attended a birthday party for Luis Valenzuela on Newell Street in Huntington Park on the night of April 18, 2009. A number of the guests at the party, including Sanchez, were members of the Florencia 13 criminal street gang; and Valenzuela's family's home, where the party was held, was known to law enforcement as a location where Florencia 13 gang members congregated.

Between midnight and 1 a.m. on April 19, 2009 a black pickup truck with four or five men and two women arrived outside the house where the party was taking place. Only Magaly Villalobos had been invited (by her friend Elizabeth Rios, Valenzuela's sister-in-law), and she had been told to come alone to the party and not to bring any men with her. Paredes was one of the men in the truck. The men, including Paredes, were members or associates of the 18th Street criminal street gang, a rival of the Florencia 13 gang. Paredes was wearing a black-and-white Oakland Raiders football jersey/hoodie with the number 18, an item of clothing associated with the 18th Street gang.

While the driver waited (or, perhaps, searched for a parking space), all the passengers got out of the truck; and several of them walked down the long driveway toward the backyard party, quickly looked in, apparently saw men they recognized as

2

Florencia 13 members, and then walked back up the driveway. According to her testimony at trial, Elizabeth Rios and Sanchez also walked up the driveway following the uninvited guests. One of the men from the truck, bald and wearing the hood of his sweater up covering his head, came back toward them and asked Sanchez, "Where are you from?"—a gang challenge. Sanchez did not respond and, instead, started to turn back toward the party. The man shot Sanchez several times in the back of the neck, lower left shoulder and lower left back. Sanchez died as a result of the gunshot wounds.

Rios testified she could not identify Paredes as he appeared in court as the shooter "because he grew his hair or something." She also was unable to identify the shooter during police interviews shortly after the incident or at Paredes's preliminary hearing. However, while testifying at trial, Rios selected Paredes's picture from a photographic six-pack lineup and stated unequivocally he was the man who had shot Sanchez.

Jeannette Gutierrez, Villalobos's cousin and the other young woman in the truck that night, testified at trial that she and Villalobos had stayed near the curb after getting out of the truck, talking to Villalobos's friend. The men walked down the driveway, came back and reentered the truck except for Paredes. Gutierrez heard several gunshots, and then Paredes got into the truck. As they drove away from the scene, Gutierrez saw that Paredes had a gun with him. Gutierrez also testified Paredes had the hood on his jersey up most of the night, covering his head.

Paredes testified in his own defense. Although a member of the 18th Street gang since he was nine years old, Paredes stated he had been attempting to distance himself from the gang at the time of Sanchez's murder in 2009, primarily because he had learned his girlfriend was pregnant. Accordingly, he was growing out his hair and taking steps to have his gang-related tattoos removed. He acknowledged going to the Huntington Park party with other 18th Street gang members; a member of the Watts Varrio Grape gang, Gutierrez's boyfriend, was also with them in the truck. Paredes also admitted he and others got out of the truck, walked down the driveway and looked into the backyard party shortly before Sanchez was shot. However, Paredes insisted he was not involved in

3

shooting Sanchez. Rather, when he learned that most of the people at the party were rival gang members, he urged his group to leave because he did not want the "drama": "At that time I'd already been shot. I had my kid on the way." Paredes stated he was back inside the pickup truck when he heard several gunshots. The Watts Varrio Grape gang member then got into the truck and said, "They're shooting at us"; and the group drove away.

Paredes conceded he had lied to police officers when interviewed following his arrest, denying during his initial interview he had been in the black pickup truck at all that day or had gone to the party at the Newell Street location. He also acknowledged he had never told the police—or anyone other than his lawyer—that a Watts Varrio Grape gang member was in the pickup truck with the 18 Street gang members. Paredes said he believed he was being set up by his friends or "homies" because he was trying to leave the gang.

2. *The Charges; Paredes's Conviction and Sentence*

Paredes and Villalobos were jointly charged in an information filed December 17, 2009 with the murder of Sanchez (Pen. Code, § 187;[1] count 1) and shooting at an inhabited dwelling (§ 246; count 2). As to both charges it was specially alleged a principal had personally and intentionally discharged a firearm causing great bodily injury or death (§ 122022.53, subds. (d), (e)(1)), Paredes had personally and intentionally discharged a firearm causing great bodily injury or death (§ 122022.53, subd. (d)), and the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members (§ 186.22, subd. (b)). Villalobos was alleged to have been a minor who was at least 16 years old at the time of the offenses.

Paredes was charged in the same information with several drug and firearm offenses arising from a different incident. He pleaded not guilty to all charges and denied

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

4

the special allegations.  The court subsequently granted Paredes's motion to sever the additional charges from counts 1 and 2, as well as to sever his case from Villalobos's.

Following a jury trial Paredes was found guilty of first degree murder with true findings he had personally used a firearm during the offense causing great bodily injury or death and had committed the offense for the benefit of a criminal street gang.  He was found not guilty of shooting at an inhabited dwelling.  The remaining charges were dismissed in furtherance of justice under section 1385.  Paredes was sentenced to an aggregate indeterminate term of 50 years to life in state prison.

**DISCUSSION**

1. *The Photograph of Paredes's "Enemy Killer" Tattoo and the Expert Testimony Concerning Its Meaning Were Properly Admitted*

Paredes had a tattoo on the side of his head with the words "enemy killer" and one on his arm of a clown holding a gun with smoke coming from the barrel.  He had numerous other tattoos on his neck, arms and chest including several with the number 18 or some variation of a reference to the 18th Street gang.

Outside the presence of the jury, after a defense objection, the People argued photographs of the head and clown tattoos and the testimony of their gang expert, Los Angeles Police Officer Guillermo Delariva,[2] as to their meaning were relevant, not only with respect to the elements of the criminal street gang enhancement allegation, but also as to Paredes's motive and intent (specifically, premeditation) and properly admitted at trial:  "He holds himself out with the art on his body [a]s a shooter for 18th Street."  The court asked whether the expert would testify the tattoos meant Paredes had killed someone, which it believed was defense counsel's principal concern.  The prosecutor responded, "No, it's that he is holding himself out there as being willing to kill his enemies."

_____

[2]     At the time of trial Officer Delariva had been a police officer for six years and worked in a gang enforcement unit for two years.  Delariva also testified he grew up in a neighborhood with Hispanic gangs in Orange County.  He had previously testified in court as a gang expert.

Defense counsel still objected, arguing the photograph of the "enemy killer" tattoo and the proposed expert testimony regarding it were "highly prejudicial" and "more prejudicial than probative to anything in this case." In particular, counsel argued Paredes acquired the tattoo following his brother's murder, four years before Sanchez was shot, and was thus too remote to be meaningful evidence of his client's state of mind in 2009. Defense counsel also asserted the proposed testimony from the gang expert was far beyond his expertise and improperly invaded the province of the jury. After expressly considering Evidence Code section 352's mandate to weigh probative value against undue prejudice, the court allowed the evidence to be introduced.

Before the jury Officer Delariva testified he had previously seen tattoos like the clown tattoo. In speaking to gang members from 18th Street, as well as other Hispanic gangs, he had learned a clown holding a gun "means basically you like guns" and the smoke coming out that you had shot a gun. As for the tattoo on the side of Paredes's head, Delariva again testified he had seen other gang members with tattoos similar to this one. Delariva explained the enemies referred to in these tattoos were rival gangs, "so every gang member will have different tattoos for who they don't like." Delariva was then asked, "What's the meaning of this specific tattoo? Have you talked to gang members about the tattoos they have, either this tattoo or like the tattoo?" Delariva responded, "Basically what it means having something like this or anything crossed out, you don't like them. You see them, you assault them. It's just basically putting it out there that you don't like these guys." Finally, asked about the array of tattoos that a gang member might have on his body, Delariva testified, "The more tattoos you have claiming your gang, out there it's basically more you're claiming your hood. Doesn't matter where you're from, if you shave your head, take off your shirt means you're putting it out there."

Relying primarily on *People v. Karis* (1988) 46 Cal.3d 612 (*Karis*), Paredes contends the photograph of his "enemy killer" tattoo and Officer Delariva's testimony interpreting it were inadmissible propensity evidence. He also separately contends

6

Delariva's opinion testimony was improper, offered without factual support and consisting of impermissible personal speculation about Paredes's state of mind when he obtained the tattoo. Neither argument has merit.[3]

In *Karis, supra*, 46 Cal.3d 612, a capital case in which the defendant had been convicted of first degree murder with special circumstances, kidnapping and rape, the Supreme Court considered whether the defendant's statement he would not hesitate to eliminate witnesses if he committed a crime was admissible under the state-of-mind (statement of intent) exception to the hearsay rule created by Evidence Code section 1250. The Court first explained the evidence was relevant as evidence of motive (the defendant was charged with killing one of his rape victims), as well as to the issue of deliberation and premeditation. Noting Evidence Code section 1101's limitation on the admissibility of evidence of uncharged crimes if its only relevance is to show the defendant had a propensity to commit a crime, the Court then observed, "Evidence of a defendant's statement regarding possible future criminal conduct in a hypothetical situation has at least as great a potential for prejudice in suggesting a propensity to commit crime as evidence of other crimes. Therefore, the content of and circumstances in which such statements are made must be carefully examined both in determining whether the statements fall within the state-of-mind exception, as circumstantial evidence that defendant acted in accordance with his stated intent, and in assessing whether the probative value of the evidence outweighs the potential prejudicial effect." (*Karis,* at p. 636.) Finally, the Court held, "[S]tatements of intent of this nature, reflecting intent to kill a particular category of victims in specific circumstances, fall within the state-of-

---

[3] Paredes also insists these evidentiary rulings by the trial court violated his state and federal constitutional rights to due process and a fundamentally fair trial. Even if Paredes's constitutional claims were preserved by appropriate objections in the trial court (see *People v. Yeoman* (2003) 31 Cal.4th 93, 113), as a general rule application of state evidentiary rules do not impermissibly infringe a defendant's constitutional rights. (See, e.g., *People v. Samuels* (2005) 36 Cal.4th 96, 114; *People v. Benavides* (2005) 35 Cal.4th 69, 91; see also *People v. Lucas* (2014) 60 Cal.4th 153, 270.)

mind exception to the hearsay rule. [Citation.] The evidence is therefore admissible unless the circumstances in which the statements were made, the lapse of time, or other evidence suggests that the state of mind was transitory and no longer existed at the time of the charged offense." The *Karis* Court also held the trial court did not abuse its discretion under Evidence Code section 352 in admitting the evidence, emphasizing "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*Karis*, at p. 638.)

Contrary to Paredes's contention, *Karis* does not establish a separate or additional standard for evaluating the admissibility of so-called propensity evidence. As discussed, this aspect of the decision was concerned principally with the hearsay nature of the defendant's statement and the applicability of the state-of-mind exception to the hearsay rule, as well as the weighing of probative value and undue prejudice required by Evidence Code section 352. The Court's reference to evidence of uncharged crimes and the highly prejudicial nature of propensity evidence was made in that context. Here, in contrast, there was no hearsay problem: Paredes concedes the tattoo on the side of his head was an admission within the meaning of Evidence Code section 1220[4] and was admissible if relevant and not excludable under Evidence Code section 352. (See, e.g., *People v. Horning* (2004) 34 Cal.4th 871, 898 & fn. 5 [defendant's own hearsay statements are admissible]; see also *People v. Monterroso* (2004) 34 Cal.4th 743, 773 [rejecting challenge to admission of evidence of racist tattoo; evidence was relevant to show motivation for murder, and its probative value not outweighed by its potential

---

[4] Evidence Code section 1220 provides, "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity." Because it found the statement admissible under Evidence Code section 1250, the Supreme Court in *Karis* did not address whether the statement was also admissible under Evidence Code section 1220. (*Karis, supra*, 46 Cal.3d at p. 635.)

prejudicial effect]; *People v. Ochoa* (2001) 26 Cal.4th 398, [evidence of "187" tattoo on defendant's forehead and detective's testimony regarding its significance properly admitted by trial court as an admission of defendant's conduct and a manifestation of his consciousness of guilt].)

The tattoo evidence was unquestionably relevant—that is, "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210)—to Paredes's continued involvement in the 18th Street gang, to the gang-related nature of the crime itself, to the motive for the shooting and, if the jury believed he was the shooter, to his specific intent. To be sure, defense counsel attempted to minimize the tattoo's importance by emphasizing Paredes had obtained it four years before Sanchez was murdered, and Paredes claimed he was growing his hair out at the time of the shooting to cover his gang tattoos. Those factors might properly be considered by the jury in weighing the significance of the evidence (as well as the fact that it apparently was not one of the tattoos Paredes was having removed in 2009); they did not make it irrelevant to disputed issues at trial.

Similarly, the trial court did not abuse its broad discretion in concluding the probative value of the photograph and expert testimony regarding the meaning of the tattoo was not clearly outweighed by its undue prejudicial effect. As the Supreme Court explained in *Karis*, "undue prejudice" within the meaning of Evidence Code section 352 refers not to evidence that proves guilt, but to evidence that prompts an emotional reaction against the defendant and tends to cause the trier of fact to decide the case on an improper basis. (*Karis, supra*, 46 Cal.3d at p. 638.) "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. . . . [E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side

9

because of the jurors' emotional reaction." (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439; see *People v. Leon* (2010) 181 Cal.App.4th 452, 461-462 (*Leon*).)

Given the abundant gang-related evidence properly admitted in this case, including testimony regarding the rivalry between Florencia 13 and the 18th Street gangs and Paredes's own lengthy gang history, the trial court, which carefully considered the issue, could reasonably conclude the evidence of the "enemy killer" tattoo would not inflame the emotions of the jury. As the Court of Appeal reasoned in *Leon* in rejecting an Evidence Code section 352 challenge to the admission of testimony regarding the meaning of defendant's gang moniker, which was derived from the movie character "Chucky"—"a 'homicidal doll' that 'comes to life' and 'goes about slashing people'" (*Leon, supra*, 181 Cal.App.4th at p. 461)—"A defendant charged with committing a crime for the benefit of a criminal street gang has no entitlement to an antiseptic portrayal of himself. If he elects to portray himself as a killer before he commits a murder, he should not be able to have what is tantamount to a 'name change' thereafter." (*Id*. at p. 462.)

Paredes's second ground for challenging Officer Delariva's testimony concerning the "enemy killer" tattoo—that it lacked factual support and was improperly offered to prove Paredes's state of mind when he obtained the tattoo—is equally unpersuasive. Delariva testified he had seen other gang members with tattoos similar to Paredes's and, based on his familiarity with gangs and gang life, offered his opinion as to what those tattoos signified within gang culture, not what Paredes was actually thinking when he acquired the tattoo following his brother's murder. Such testimony was well within the accepted expertise of gang officers. (See, e.g., *People v. Ochoa, supra,* 26 Cal.4th at p. 438 [approving the admission of expert testimony to explain the significance of defendant's gang-related tattoos]; see generally *People v. Lindberg* (2008) 45 Cal.4th 1, 46-47 ["[n]umerous decisions in federal and other state cases also have upheld the admission of expert testimony to explain the culture and beliefs of White supremacy groups and gangs and to interpret tattoos, symbols, and graffiti associated with these

10

groups when such evidence was relevant to the issues at trial"]; *People v. Gardeley* (1996) 14 Cal.4th 605, 617 [recognizing that "[t]he subject matter of the culture and habits of criminal street gangs" satisfies the criterion of admissible expert testimony under Evid. Code, § 801].)

Moreover, the meaning of those tattoos was not, as Paredes now seems to suggest, so common or obvious that no expert was needed. Indeed, when testifying on his own behalf, Paredes disputed Officer Delariva's interpretations, insisting the clown holding a smoking gun "didn't have no symbolism what you guys try to say it is . . . . If you can see the smoke is just part to cover up the collage. The clown, I like the drawing." Similarly, Paredes testified the "enemy killer" tattoo was not intended to be taken literally: "I told you, I was a kid. I was mad. I had just lost my brother. I guess it was kind of a way of just putting it out there." In short, it was not an abuse of discretion for the trial court to conclude expert opinion testimony on this topic was appropriate and to permit Delariva to provide that testimony. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 949; *People v. Gardeley, supra*, 14 Cal.4th at pp. 619-620.)

   2. *The Court Did Not Abuse Its Discretion in Precluding Paredes from Testifying About the Effect of His Brother's Shooting on His Mother*

As discussed, Paredes admitted at trial he was a member of the 18th Street gang, which he had joined when he was nine years old, and had been in the company of fellow gang members in the pickup truck that traveled to the Newell Street murder scene, as well as earlier that evening, while wearing a Raiders "18" jersey. Nonetheless, in addition to denying involvement in the shooting of Sanchez, Paredes testified at the time of the incident he was attempting to distance himself from the 18th Street gang and disengage from the gang culture and lifestyle, including growing out his hair to cover the tattoos on his head and having other gang-related tattoos removed. Asked why on direct examination, Paredes responded, "Because I wanted to take them off when I found out my girlfriend was pregnant. Just didn't want them no more."

Paredes, who was 21 years old at the time of the crime, testified his older brother, also an 18th Street gang member, had been killed in a gang-related shooting when

11

Paredes was 14 years old, an event that led him to become more, not less active in gang life; and Paredes himself was seriously wounded in a gang-related shooting when he was 18 years old. On further redirect examination (that is, the third time his lawyer questioned him at trial), Paredes was asked why he wanted to leave, rather than stay and fight when he saw there were Florencia 13 gang members at the Newell Street party. Paredes responded, "I had a son on the way. I'd already been shot. I didn't want to involve myself in that no more." The following exchange then took place:

"Q [defense counsel] Had the fact -- How many brothers do you have?

"A [Paredes] One brother.

"Q Was that the one that was killed?

"A Yes.

"Q And you were shot?

"A Yes.

"Q How did that impact your mother, the fact that your older brother was killed and you were shot five times?"

At this point the prosecutor objected, "relevance and calls for speculation." The court sustained the objection. Defense counsel asked, "Did you want to put your family through that again." The prosecutor's objection on relevance grounds was again sustained. Defense counsel said he had no further questions.

On appeal Paredes contends the trial court erred in preventing him from describing the effect on his mother of the death of one son and injuries to another in gang-related shootings—events that had occurred years before Sanchez was killed. He argues the evidence was highly relevant to his lack of motive (that is, his desire to disengage from gang life) and insists its erroneous exclusion denied him his rights to due process and to present a defense.

The trial court did not abuse its discretion in sustaining the People's objection. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1123 ["[w]e apply the deferential abuse of discretion standard when reviewing a trial court's ruling on a relevance objection"];

12

*People v. Linton* (2013) 56 Cal.4th 1146, 1191 [abuse of discretion standard applied to rulings on objections to questions that called for speculation]; *People v. Jones* (2013) 57 Cal.4th 899, 957 [abuse of discretion standard applied to ruling on objection for lack of foundation].) Paredes's testimony concerning his reasons for attempting to leave gang life supported his version of events—he had urged the 18th Street group to leave the Newell Street site without confronting the Florencia 13 gang members and was already inside the pickup truck when shots were fired—and was certainly relevant within the meaning of Evidence Code section 210. He testified extensively on that topic during his direct examination. How her sons' involvement in gang shootings in 2002 and 2005 affected his mother, however, had no "tendency in reason to prove or disprove any disputed fact" and, absent an adequate foundation, was not within Paredes's personal knowledge (see Evid. Code, § 702, subd. (a) [testimony of a witness is inadmissible unless he has personal knowledge of the matter].) Significantly, Paredes was not asked how his mother had acted in his presence in response to those events and whether his mother's reaction played any role in his decision to distance himself from his gang. Those questions might have been proper; the one posed by his counsel plainly was not.[5]

      3. *The Court's Instruction Regarding Statements Made to an Expert Was Proper*

To support his defense Paredes presented expert testimony from Fabian Montes, a former gang member who left gang life, worked for 10 years with Father Gregory Boyle at Homeboy Industries and now trains probation officers, teachers and psychologists for gang intervention work. Montes spoke with Paredes and with the mother of his child and reviewed some of the police reports in this matter. Based on this information Montes opined that in 2009 Paredes, although still a gang member, was in transition, trying to change his lifestyle, getting out of the gang.

---

[5]     The trial court's entirely proper exclusion of Paredes's answer to this question did not violate his constitutional rights to a fair trial and to present a defense. (*People v. Lucas, supra,* 60 Cal.4th at p. 270; see fn. 3, above.)

The trial court instructed the jury, in the language of CALCRIM No. 332, "Witnesses were allowed to testify as experts and to give their opinions. You must consider the opinions, but you are not required to accept any opinion(s) as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness . . . consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. . . ."

With respect to Montes, but not the prosecutor's expert, Officer Delariva, the court instructed in the language of CALCRIM No. 360, "Witness Fabian Montes testified that in reaching his conclusions as an expert witness, he considered statement(s) made to him by a person named Diana, who is apparently the mother of the defendant's son. Such statements included references to she and the defendant having been in the process of moving at some point and to whether or not the defendant had a normal childhood. You may consider that or those statement(s) only to evaluate the expert's opinion. Do not consider that or those statement(s) as proof that the information contained in the statement(s) is true."

For good reason, Paredes does not dispute that CALCRIM No. 360 is a correct statement of the law: Any comments Diana may have made to Montes that he relied upon in forming his opinions were hearsay. Because none was admitted under an applicable hearsay exception, they could not properly be considered for their truth. (See, e.g., *People v. Ledesma* (2006) 39 Cal.4th 641, 700, fn. 15 ["if the statements concerning which a psychiatrist testifies do not fall within an exception to the hearsay rule, they would be admissible only as the basis of the psychiatrist's opinion, and a limiting instruction normally would be given if requested"].) Nonetheless, citing *People v. Hunter* (2011) 202 Cal.App.4th 261, and emphasizing the instruction was directed only to Montes and not Officer Delariva, Paredes argues the instruction impermissibly lightened the prosecution's burden of proof by targeting only the defense expert's testimony:

14

"While technically accurate, the instruction invited the jury to conclude that information relied upon by the defense expert was unproven, not worthy of belief. This in turn invited the jury to reject the conclusions of the defense expert as having been grounded on unreliable facts and therefore as insufficient [to] raise a reasonable doubt."

In *Hunter* the only disputed issue at trial was whether defendant had personally used a firearm within the meaning of section 12022.53, subdivision (b), which carries a 10-year mandatory sentence enhancement, in the commission of several robberies he admitted he had committed. (*People v. Hunter, supra*, 202 Cal.App.4th at p. 264.) After all evidence had been presented, the People requested a "pinpoint instruction" telling the jury the inability of defendant's victims to say conclusively defendant had used a real gun "does not create a reasonable doubt as a matter of law that the gun was not a firearm." The court gave the proposed instruction over defendant's objection. (*Ibid*.)[6] After concluding the instruction did not direct a verdict on the issue and, therefore, was not reversible error per se, the Court of Appeal held there were two problems with the challenged instruction. First, the initial sentence of the instruction, which told the jury an object's appearance and the defendant's conduct could constitute sufficient circumstantial evidence to support a finding the object was a firearm, was unduly argumentative: "[T]he jury could just as accurately have been told the opposite, that when a defendant displays an object that looks like a gun, the object's appearance and the defendant's conduct may constitute sufficient circumstantial evidence to support a finding *that it was not a firearm*." (*Id.* at pp. 275-276.) Second, by instructing that evidence properly before

---

[6] The instruction given by the court stated, "'When a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm. The victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm.'" (*People v. Hunter, supra*, 202 Cal.App.4th at p. 267.) This language was taken from an appellate decision discussing the sufficiency of the evidence from which a jury may infer that a firearm was used in the commission of an offense. (See *id*. at p. 277.)

15

the jury was insufficient to create reasonable doubt about an issue the People were required to prove, the trial court had impermissibly lightened the prosecution's burden of proof. (*Id*. at p. 277.) The *Hunter* court then concluded the erroneous instruction was harmless. (*Id*. at p. 278.)

Hunter is of no assistance to Paredes. First, as the *Hunter* court explained, the challenged instruction was given in that case because "the trial judge much too quickly assumed 'that a correct statement of substantive law will provide a sound basis for charging the jury.'" (*People v. Hunter, supra*, 202 Cal.App.4th at p. 277.) Here, in direct contrast, far from transposing a correct statement of substantive law from one context to another, the trial court, without prosecution request, gave a Judicial-Council-approved official jury instruction in precisely the situation it was intended to be used. (See Cal. Rules of Court, rule 2.1050(e) ["[u]se of the Judicial Council instructions is strongly encouraged"].) CALCRIM No. 360, as given, was not only a correct statement of the law in the abstract, but also an entirely proper, nonargumentative jury instruction.

Second, again unlike the situation in *Hunter* in which the challenged instruction was directed to the sole element of the prosecution's case and expressly discussed the People's burden of proof, CALCRIM No. 360 concerned only the hearsay bases for the defense expert's opinion offered in support of Paredes's explanation as to why he would not have participated in shooting Sanchez. It did not involve the elements of the People's case and did not lighten in any way their burden of proof. To the contrary, the jury was fully instructed as to the elements of first degree murder (CALCRIM Nos. 520 & 521) and, pursuant to CALCRIM NO. 220, told, "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt."

Finally, the inclusion of Montes but not Officer Delariva in the instruction was not error. Although Delariva testified in general about conversations he had had with gang members as part of the bases for his expert opinions, there was no suggestion such information had any independent significance in the case. In contrast, statements about

16

Paredes's dysfunctional childhood and plans to move, which Diana made to Montes (and which Paredes did not confirm during his own testimony in the case),[7] supported not only Montes's opinion that Paredes was transitioning out of gang life in 2009 but also, if improperly accepted as true, could have provided additional evidentiary support for the defense.

## DISPOSITION

The judgment is affirmed.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.[*]

---

[7] In fact, Paredes answered "yes" when asked, "You had a normal childhood?"

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17